THE STATE v. RAY STUDEBAKER, Appellant.—66 S. W. (2d) 877.

Division Two, December 20, 1933.

472

*William G. Lynch* for appellant.

*Roy McKittrick*, Attorney-General, and *Frank W. Hayes*, Assistant Attorney-General, for respondent.

ELLISON, P. J.—The defendant appeals from a conviction of manslaughter in the Circuit Court of Jackson County, his punishment being assessed by a jury at four years' imprisonment in the penitentiary. The specific charge was that he "feloniously, carelessly, recklessly and with culpable negligence" drove his automobile with great force and violence against one Miss Helen Griffith, as she was standing in a safety zone at Twenty-seventh and Main Streets in Kansas City on the evening of November 11, 1931, about six P. M. waiting to board a street car, thereby killing her. The assignments in the defendant's brief are that the trial court erred in overruling his demurrer to the evidence at the close of the whole case; and in giving and refusing certain instructions. The defendant's contentions are principally directed to one legal question—what character of dereliction constitutes *criminal* negligence; and one main fact question—whether he was guilty of that kind of negligence, or merely common-law negligence.

The defendant and his partner, Edmund Batten, ran a barber shop in Kansas City, Kansas. On Armistice Day they closed at ten in the morning. Between then and noon they drank two bottles of home-brew beer, each. After lunch they were engaged with other matters until the latter part of the afternoon, when they drove in the defendant's Hudson automobile to the residence of a friend in the southwest part of Kansas City, Missouri. Police officers testified at the trial that after their arrest both men said they had had two drinks of liquor while calling on this friend. On the witness stand they and their friend denied it.

At any rate, a little before six o'clock in the afternoon they were returning from the home of the friend, driving north on Main Street. One hundred feet or so south of its intersection with Twenty-seventh Street, there is a safety zone on Main Street along the east side of the street car double tracks. The zone is 100 feet long, north and south, and five or six feet wide. It is marked by "buttons" shaped like hemispheres four or five inches high, set on the pavement at intervals parallel to the adjacent street car rail. At each end of the zone are four or five buttons perhaps six inches high, and on the south end, set out eighteen feet beyond these, is a "pilot button." The distance from the safety zone across the traffic way to the east curb of Main Street is a little less than twenty-seven feet. At that point the street runs down hill from south to north the incline beginning two or three blocks back.

The day had not been clear and there is a conflict in the testimony as to whether the pavement was wet or dry at the time of the casualty, but at least three witnesses for the State said it was dry. On the other hand several witnesses for the defendant declared a mist was falling which required the use of windshield wipers on automobiles, and that the streets were wet. Also, there was controversy as to the amount of light falling on the safety zone. The State proved that on the east side of Main Street at that point there was a yard for the storage of used automobiles, which had six elevated flood lights of 200 watts each; that there was a light on the corner of a building next to this yard; that there were street lights on the west side of Main Street about opposite the north and south ends of the safety zone, and a light at the Twenty-seventh Street intersection 100 feet or more north of the safety zone. A number of witnesses said these various sources of illumination produced sufficient light to make persons in the safety zone plainly visible. The defendant, himself admitted he saw the persons standing there 100 to 120 feet before he got to them, and one witness for the State said he saw the defendant's car coming from the south when it was half a block away.

As the defendant approached the safety zone the wheels of his automobile were astride the east rail of the east street car track.

The State's witnesses estimated the speed at which he was traveling at forty to fifty miles per hour. He attempted to turn to the right of the safety zone but a wheel of the automobile struck the pilot button, deflecting the car to the left, and it went straight down the safety zone at undiminished speed striking Miss Griffith and throwing her five feet in the air. She was in a group of four women standing at the north end of the zone. Two others of the women were caught by or under the car and dragged or rolled to points forty or fifty feet north of the north end of the zone. These collisions reduced the speed of the automobile some, but after getting clear of the bodies of the two women the defendant speeded up and disappeared. He drove to his home in Kansas City, Kansas. The hood and one fender of his car were dented by the collision; also one headlight was bent up at an angle of forty-five degrees and the lens thereof broken. The next morning, instead of taking the car to a garage for repairs, he had an automobile mechanic who was an old acquaintance go to his home and fix the headlight there; but he did not order the fender and hood fixed for fear the neighbors would hear the pounding. Neither did he reveal his connection with the homicide to the police until arrested three days later.

For the defendant it was shown that he had had twelve years' experience in driving automobiles, that he had never had an accident before, and that the brakes of his car were working well. He expressed the opinion that running at twenty-five miles per hour he could stop it in thirty-five or forty feet on a dry street. He was not acquainted, he said, with the part of Main Street in the vicinity of Twenty-seventh Street, not having driven there for nine years. His version of the occurrence, and that of his partner, Batten, was that he was traveling twenty-five to thirty miles per hour; and that when he attempted to turn out for the safety zone the automobile skidded on the wet pavement and slid against and over the pilot button and other buttons at the south end of the safety zone, causing him to lose control of the car, both the steering wheel and brakes. It all occurred so quickly he could not tell just what did happen. After the collision he had about come to a stop, when some man came running toward him holloing, "We will get you," so he put on speed and fled, fearing he would be mobbed. He concealed his automobile, had it secretly repaired, and did not disclose to the police his responsibility for Miss Griffith's death until his arrest three days later, all at the request of his wife and because he wanted to get the advice of his brother who was out of town at the time.

I. Section 3988, Revised Statutes 1929, provides: "Every killing of a human being by the act, procurement or culpable negligence of another, not herein declared to be murder or excusable or justifiable homicide, shall be manslaughter." As defining the words

"culpable negligence" appearing in the statute the trial court gave the following Instruction No. 4, for the State (italics ours):

"The court instructs the jury that culpable negligence is the omission on the part of one person to do some act under given circumstances which an ordinarily careful and prudent person would do under like circumstances, *showing on the part of such person a careless or reckless disregard for human life or limb*, or the doing of some act under given circumstances which an ordinarily careful and prudent person under like circumstances would not do, *showing on the part of such person a careless or reckless disregard for human life or limb*, by reason of which omission or action another person is directly endangered in life or bodily safety."

For the defendant the court gave Instruction No. 11 as follows (italics ours):

"The court instructs the jury that to make negligent conduct culpable negligence or criminal, and to make it manslaughter, if death is caused by it, the particular negligent conduct of the defendant *must be of such reckless or wanton character as to indicate on his part an utter indifference to the life of another*, who is killed as a result thereof. It is only from such culpable negligence that a criminal intent may be shown, and in the absence of such criminal intent, the crime of manslaughter has not been proved."

The defendant contends Instruction No. 4 was erroneous in that it authorized a conviction on proof of negligence showing nothing more than a *careless* disregard for human life—which he asserts is simply common-law negligence. He maintains that in order to support a conviction of manslaughter by culpable negligence the proof must show, as his Instruction No. 11 said, negligence of such reckless or wanton character as to indicate utter indifference to the life of another—a much higher degree of negligence, he affirms, than that required by Instruction No. 4. And he therefore argues there was further error in that the two instructions were inconsistent and conflicting. In support of these contentions the following manslaugter cases are cited: State v. Millin, 318 Mo. 553, 558, 300 S. W. 694, 696; State v. Baublits, 324 Mo. 1199, 1211, 27 S. W. (2d) 16, 21; State v. Melton, 326 Mo. 962, 964, 33 S. W. (2d) 894. We shall review them, and others, before attempting a discussion of the questions raised.

In the Millin case the lower court had given an instruction defining culpable negligence in accordance with a definition appearing in Shearman & Redfield on Negligence, section 7, and quoted in State v. Emery, 78 Mo. 77, 80, 47 Am. St. Rep. 92, as follows: "Culpable negligence is the omission to do something which a reasonable, prudent and honest man would do, or the doing of something which such a man would not do under all the circumstances surrounding each particular case." The Millin opinion condemned this instruc-

478

tion saying it was "nothing more than a definition of ordinary negligence;" and that "it entirely omits the element that the life or limb of another person is endangered by such act, or failure to act."

But the Millin decision went further. In State v. Coulter, 204 S. W. 5; State v. Miller, 234 S. W. 813, 814; State v. Weisman, 256 S. W. 740; and State v. Winkler, 309 Mo. 28, 36, 273 S. W. 1040, 1042, this court had approved other instructions modeled after the one in the Emery case, defining culpable negligence substantially as follows (the instruction is quoted from the Weisman case):

"The omission on the part of one person to do some act, under given circumstances, which an ordinarily careful and prudent man would do under like circumstances or the doing of some act under given circumstances which an ordinarily careful and prudent man, under like circumstances, would not do, by reason of which omission or act another person is directly endangered in life or bodily safety."

Speaking of this instruction the Millin case said it fell short of being a correct definition of culpable negligence because it omitted the element that negligence to be criminal must amount to "carelessness or recklessness incompatible with a proper regard for human life;" or must be such as indicates "a carelessness or recklessness of human life," citing State v. Emery, 78 Mo. l. c. 78, 47 Am. St. Rep. 92, and State v. Haines, 160 Mo. 555, 569, 61 S. W. 621, 625. Toward the close of the opinion the court said that as a basis for convicting a person of manslaughter by culpable negligence "there must be facts and circumstances in evidence tending to prove that such person was actuated at the time by a reckless disregard of the consequences of his act, from which the jury may reasonably infer the criminal intent so essential to guilt in every lawful conviction for violation of our criminal statutes."

This decision in the Millin case went down in December, 1927. About a year later the case of State v. Murphy was tried in the Circuit Court of St. Louis. Evidently in an effort to conform to the Millin decision the trial court gave an instruction defining culpable negligence which adopted the language of the instruction in the Weisman case, and added what the Millin case said it lacked, or at least, what the lower court understood the Millin case to say it lacked. The instruction given was identically the same as Instruction No. 4 in the instant case. The words added in the Murphy case were those we have underscored in the instruction as set out above in this opinion: that is to say, the instruction made the additional requirement (to that in the Weisman case) that the negligent act or omission must be one *showing a careless or reckless disregard for human life or limb*. When the Murphy case came to this court on appeal the instruction was held correct, 324 Mo. 183, 188, 23 S. W. (2d) 136,

138. Blair, J., author of the opinion of the Millin case concurred in this Murphy case.

Later the same year the case of State v. Baublits, 324 Mo. l. c. 1211, 27 S. W. (2d) l. c. 21, cited by appellant, came before this court. In that case an instruction defining culpable negligence had been given, substantially identical with the one in the Weisman case. It omitted the requirement that the negligent act or omission must be such as to evince a disregard of human life or limb; and the judgment of the lower court was reversed for that reason. The Baublits opinion said: "Culpable negligence is tantamount to gross carelessness or recklessness incompatible with a proper regard for human life;" and quoted from Cannon v. State (Fla.), 107 So. l. c. 363, where it was said: "The negligence complained of must be of a 'gross and flagrant character, evincing reckless disregard of human life, or the safety of the persons exposed to its dangerous effects, or there is that entire want of care which would raise the presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, . . .'" Following the above quotation the Baublits opinion says "see also"—the Murphy case. In other words the Murphy case is cited, not overruled.

The third case cited by appellant, State v. Melton, 326 Mo. l. c. 964, 33 S. W. (2d) l. c. 895, likewise had an instruction defining culpable negligence based on the Weisman case. In this decision this court expressly overruled the Weisman case and said, practically in the language of appellant's Instruction No. 11 here: "To make negligent conduct culpable or criminal and make it manslaughter, the particular negligent conduct of the defendant must have been of such reckless or wanton character as to indicate on his part utter indifference to the life of another who is killed as a result thereof." At the close of the opinion the court remarked the defendant probably would not have been convicted if the jury had been told his negligence must have been "of such character as to evince a reckless disregard on his part for human life or bodily safety."

There are two more recent cases on the question. One of these is State v. Nevils, 330 Mo. 831, 835, 51 S. W. (2d) 47, 48, where the defendant, a constable who had a warrant for the arrest of C on a felony charge, shot into a passing automobile which did not stop and submit to search when hailed. C was not in the car and the shot killed B. The court gave an instruction on manslaughter which did not expressly require the jury to find the defendant's negligence was incompatible with a proper regard for human life. On defendant's appeal this omission was complained of, the Millin, Baublits and Melton cases, supra, being cited. But this court ruled it was unnecessary for the instruction to define culpable negligence in that way if it conveyed the same idea in other words. And it was held

since the instruction did require a finding that the defendant carelessly and recklessly shot into the car without making a reasonably prudent investigation, it was sufficient. In particular it was said the use of the word "recklessly" saved the instruction from error even if it otherwise would have been bad.

The latest case is State v. Armbruster (Mo.), 63 S. W. (2d) 144, a manslaughter prosecution for culpable negligence in the driving of an automobile with fatal results to a pedestrian, like this case. The opinion there quotes with seeming approval the definition of culpable negligence given in State v. Emery, 78 Mo. l. c. 80, 47 Am. St. Rep. 92, which was later condemned and disapproved in the Millin case; but on motion for rehearing a per curiam was added to the Armbruster opinion stating no question as to the propriety of incorporating that definition into an instruction was involved, the only question before the court being the sufficiency of the evidence.

So much for the Missouri cases. As applied to civil actions the words "culpable negligence" means about the same as *actionable* negligence. [45 C. J., sec. 3, p. 633.] The old definition thereof quoted in the Emery and Armbruster cases, supra (that it is an act or omission of which a reasonably prudent man would not be guilty in the same circumstances) has been followed in many states, sometimes in criminal cases. [Words and Phrases, 1st, 2nd, 3rd and 4th Series.] But it is evident a person ought not to be held responsible criminally for any and every negligent act that would subject him to civil liability for damages. Mere inattention or mistaken judgment resulting even in the death of another is not criminal unless the *quality* of the act makes it so. On the other hand, it is said carelessness may be so gross and wanton as to import malice in which case the homicidal act would be murder. [29 C. J., sec. 4, p. 1155; Sims v. State, 149 Miss. 171, 115 So. 217, 219; State v. Brown (Del.), 2 Marvel, 380, 36 Atl. 458, 465.] The extent to which the negligent act obviously imperils the life of another measures the state of mind of the doer in legal contemplation and therefore his criminality. Nash v. United States, 229 U. S. 373, 377, 33 Sup. Ct. 780, 57 L. Ed. 1232, declares, " 'An act causing death may be murder, manslaughter, or misadventure, according to the degree of danger attending it' by common experience in the circumstances known to the actor." [See, also, Dist. of Columbia v. Colts, 282 U. S. 63, 73, 51 Sup. Ct. 52, 75 L. Ed. 177.]

In the zone between these two extremes—misadventure or mere civil liability, on the one hand, and carelessness so gross and wanton as to import malice, on the other, the killing of a human being by culpable negligence is manslaughter. The fundamental requirement fixing criminal responsibility is knowledge, actual or imputed, that the act of the slayer tended to endanger life. [13 R. C. L., sec. 161, p. 859.] Or, as is said in 29 Corpus Juris, section

141, page 1154, "It must be shown that a homicide was not improbable under the facts as they exists which should have influenced the conduct of accused." The rule is summed up in this way in State v. Tankersley, 172 N. C. 955, 90 S. E. 781, L. R. A. 1917C, 533, 535:

"The decisions of the courts have described in different terms the kind of negligence required to constitute crime. In some of them it is said to be negligence that is 'culpable and gross.' In others, that it must be such as to show a reckless disregard of the safety of others, etc., but all of the authorities are agreed that, in order to hold one a criminal, there must be a higher degree of negligence than is required to establish negligent default on a mere civil issue, and that, in order to a conviction of involuntary manslaughter, attributable to a negligent omission of duty, when engaged in a lawful act, it must be shown that a homicide was not improbable under all the facts existent at the time and which should reasonably have an influence and effect on the conduct of the person charged."

Instruction No. 4 in this case in endeavoring to conform to the foregoing rule, said the negligent act or omission must be one "showing . . . a careless or reckless disregard for human life or limb." The defendant insists the use of the words "careless *or* reckless" in the disjunctive, and without a qualifying adverb, such as "grossly," or some other expression importing the superlative of negligence, was error. In so contending, he points to and relies upon the strong language used in the recent Millin, Baublits and Melton cases reviewed in the preceding paragraphs.

As against this we are to remember that in two early cases, State v. Emery, 78 Mo. 1. c. 78, 47 Am. St. Rep. 92, and State v. Haines, 160 Mo. 1. c. 569, 61 S. W. 1. c. 625, the expression "careless or reckless disregard for human life," or its equivalent, was used; that in the very Millin case relied on by the defendant the same language was employed in criticising certain other previous decisions of this court and in stating what necessary element they omitted from the formula they were prescribing; that Instruction No. 4, here under review, was approved in the Murphy case, 324 Mo. 1. c. 188, 23 S. W. (2d) 1. c. 138; and that the Murphy case was cited in the Baublits case, in which latter the author of the Millin opinion concurred. In other words, the Murphy case has not been overruled, or even criticized, in any subsequent decisions.

If Instruction No. 4 had merely said a careless *act or omission* of the defendant would make him criminally responsible, it would have been erroneous. But it does not say that: it declares the negligent act must show a careless *disregard of human life*. The word careless refers not to the act, but to the mental attitude of the party toward human life; and it is hard to see how a careless disregard of human life can be other than reckless. To be liable civilly, the

defendant is not bound to foresee the very results that follow from his careless act. But this instruction says the negligent act must *show* a careless disregard of life—which, it seems to the writer, is equivalent to saying a reasonably careful person doing the same act would have been guilty of a conscious disregard of life—in other words would have known a life was being endangered. If that is correct, then the act was reckless or grossly negligent, whatever epithets or adjectives be employed to describe it. While it would have been better to have omitted the word "careless" from the instruction, we cannot say the use of it, especially in connection with "reckless," made the instruction prejudicially erroneous. The conjunction "or" is frequently used to connect two words expressing the same idea. [Webster's New International Dictionary; Fernald's Connectives of English Speech, p. 235.] It was at most redundant or ambiguous. By his own Instruction No. 11 the defendant got all he was entitled to, if not more—though that is not a question for us to decide here—and the two instructions were not in conflict.

II. On the defendant's demurrer to the evidence. Substantial proof was adduced by the State showing the defendant was driving his automobile at a speed of forty, forty-five or fifty miles per hour; that a wheel of the automobile struck the pilot button of the safety zone, and that the car thence traveled the entire length of the zone, a distance of about 118 feet at undiminished speed, striking the deceased Helen Griffith and two other women at the north end of the zone. Miss Griffith was thrown five feet in the air. The two other women were dragged or rolled forty or fifty feet further, making a total distance of about 160 or 170 feet. The defendant without stopping then fled and concealed his connection with the casualty until he was apprehended by the police. We cannot see how it can be seriously argued that these facts and circumstances, as a matter of law, show nothing more than ordinary negligence. Practically all the Missouri decisions cited by both sides, on facts less aggravated, hold a case was made for the jury. We cannot accept the defendant's explanation as conclusive.

III. The trial court gave eight instructions for the State of which Nos. 2 and 4 were the principal ones. Instruction No. 2 hypothecated the facts necessary to a conviction, requiring the jury to find the defendant violently drove his automobile carelessly, recklessly, feloniously and with culpable negligence" against the body of Miss Griffith, killing her. The instruction concluded with the statement that "unless you so find the facts to be as above stated, you should acquit the defendant." Instruction No. 4, discussed in the preceding paragraphs defined culpable negligence.

The defendant asked eleven instructions of which the court gave three. One of these given instructions was No. 11, heretofore quoted,

which stated the converse of the propositions laid down in the State's principal instructions—that is, it told the jury "the particular negligent conduct of the defendant must be of such reckless or wanton character as to indicate on his part an utter indifference to the life of another, who is killed as a result thereof;" and that only from such culpable negligence can a criminal intent be shown, in the absence of which intent "the crime of manslaughter has not been proven." Given Instruction No. 14 informed the jury the defendant was not on trial for leaving the scene of an accident (in violation of Sec. 7783(f), R. S. 1929), and that in the instant prosecution they could not determine his guilt thereof; and that unless the State had proven him guilty of manslaughter beyond a reasonable doubt they must acquit him regardless of his guilt or innocence of the other offense. Given Instruction No. 15 said if the jury found the defendant was exercising ordinary care at the time of the casualty and could not have avoided the accident by the exercise of such care their verdict must be "not guilty."

Eight of the defendant's requested eleven instructions were refused; and complaint is made of the refusal of each of them. Instruction No. 9 directed an acquittal if the defendant "did not intend to harm anyone, and was acting under the reasonable belief that no harm would result from his conduct." The refusal of this instruction was not error. It was not necessary to his conviction that defendant have an actual intent to harm someone; and if he acted under the *reasonable* belief that no harm would result from his conduct, he was not guilty of any negligence at all—a hypothesis covered by his Instruction No. 15 and generally by the other given instructions.

So with Instruction No. 10, which required the jury to find beyond a reasonable doubt that at and immediately before his automobile struck the deceased, the defendant "had a criminal intent, that is to say, he reasonably could have foreseen the fatal consequences of his act, and was actuated by a reckless disregard of its consequences." Defendant's given Instruction No. 11 told the jury a criminal intent on his part could be inferred only from proof showing culpable negligence, as therein defined, and that in the absence of such intent they must acquit. Furthermore, the instruction went too far in requiring a finding that defendant reasonably could have foreseen the fatal consequences of his act. The authorities hereinbefore discussed do not say it must be reasonably apparent to the accused that the death of another *will* result from his act. If he knows or reasonably should know his act *tends* to endanger *life*, and that the death of a human being is not "improbable" as a result thereof, it is sufficient to sustain a conviction of manslaughter by culpable negligence.

Instruction No. 12 declared there was no evidence that the

death ( the deceased was caused by defendant's driving his automobile at an excessive or dangerous rate of speed. Clearly, the trial court' action in refusing this instruction was proper. The defendant's wn theory is that he ran into or skidded into the safety buttons nd as a result lost control of his car and plowed clear through and beyond the north end of the safety zone. Witnesses for the Sta e said the automobile was traveling at forty to fifty miles per hoar. It was dark or dusk and defendant was not acquainted with tJ e street. If the pavement was wet, as he testified, still greater aution was called for. To say as a matter of law that a slower speed, adjusted to the conditions, might not have averted the casualty would plainly do violence to the facts.

By Instruction No. 13 the jury were told that in determining whether the defendant was guilty of culpable negligence they should take into consideration all the facts and circumstances at and immediately preceding the time deceased was struck, and not what occurred afterward, as such facts and circumstances then appeared to the defendant.'' This instruction was incorrect. The jury had a right to consider certain of the facts and circumstances occurring after the collision, such as that two other women by the force of the momentum of the automobile were dragged or rolled forty or fifty feet on beyond the north end of the safety zone, all of which tended to show the speed at which it was traveling before the collision. Also the defendant's flight and concealment properly were for the jury's consideration.

Instruction No. 16 stated that for the purposes of the case the jury might consider two kinds of negligence, ordinary negligence and culpable negligence; and if they found the defendant was guilty only of the former and not of the latter, they should acquit him. The instruction then defines ordinary negligence and concludes by repeating that if the defendant committed only ordinary negligence the verdict should be not guilty. The question in the case was culpable negligence *vel non*. The instructions for both the State and the defendant had defined that kind of negligence and told the jury unless the defendant had been guilty of it they should acquit him. This fairly submitted the issue. It was not incumbent upon the court to define a lesser degree of negligence and say if the defendant had only been guilty of that he should be acquitted.

Instruction No. 17 directed an acquittal if the jury found the defendant was exercising ordinary care and did not know of the buttons at the safety zone; and in an effort to turn to the right struck the buttons with the result that he lost control of his car. Instruction No. 19 similarly directed an acquittal if the defendant's car skidded when he applied the brakes, thereby causing it to strike the safety buttons and get out of control. By these two instructions the defendant singled out certain facts to which he and his partner

had testified and asked the court to direct a verdict of not guilty if the jury believed them. The refusal of the instructions was not error. The ultimate issue had been submitted by other instructions which were fair to the defendant. It is said in State v. Ledbetter, 332 Mo. 225, 58 S. W. (2d) 453, 454, that it is reversible error to refuse correct instructions offered by the defendant, which are the converse of the State's principal instructions, unless the State's instructions clearly submit the converse of the facts and issues on which convictions are authorized. The State's principal instruction here did submit both sides of the issue, and the defendant got a converse instruction. He was not entitled as a matter of right to further instructions severally singling out particular facts and directing an acquittal if those facts were believed.

Instruction No. 18 told the jury there was no evidence that the defendant was intoxicated at the time his automobile struck the deceased, and that their verdict should not be influenced by any such consideration. There was evidence that the defendant and his partner, after closing their barber shop, had drunk two bottles of homebrew beer, each, before noon on Armistice Day. The police testified that after the defendant's arrest he admitted having had two drinks of liquor at the home of his friend late in the afternoon of that day. He drove directly from there to the scene of the homicide. These facts in connection with the manner of his driving and his conduct afterward, justified the refusal of the instruction, in our opinion. The State's instructions did not submit or mention the question of his intoxication.

IV. The information is in a form approved by numerous decisions. We find no error in the record proper, and the judgment is accordingly affirmed. All concur.