The State v. Cecil Knox Ruffin, Appellant.—126 S. W. (2d) 218.

Division Two, March 15, 1939.

*Homer Rinehart* and *H. D. Green* for appellant.

*Roy McKittrick,* Attorney General, and *Max Wasserman,* Assistant Attorney General, for respondent.

ELLISON, P. J.—The appellant was convicted of manslaughter in the Circuit Court of Howell County and his punishment assessed at a fine of $250 and six months' imprisonment in the county jail, for the killing of a young woman, Lillian Luna, through his culpable negligence in driving an automobile which turned over while he and Miss Luna and another couple were riding therein. The State's contentions were that appellant was under the influence of intoxicating liquor and was driving recklessly. The appellant denies that and insists the State failed to make a case for the jury.

The appellant and the deceased were about twenty years old and had been going together for about six months. Both lived in West Plains. They spent Saturday evening, July 31, 1937, with another couple, Ray Kellam and Miss Fisher, at certain dining and dancing resorts near West Plains. About 11 o'clock appellant bought a half pint of whiskey and the young people danced until midnight. During that time Kellam and the appellant each admittedly took two drinks of whiskey. A third party said he saw appellant take three drinks but that was denied by appellant. Young Kellam then telephoned the mothers of the two girls and obtained permission for them to remain a while longer. Appellant drove the party in a 1937 four door Pontiac sedan owned by his mother to the Aztec, a night club on Highway 63 some 18 miles or more north of West Plains toward Willow Springs.

At the Aztec, according to the testimony of Miss Fisher and Kellam, appellant took two drinks; also he ordered beer. Miss Fisher didn't know whether he drank the beer; Kellam said he did drink part of a bottle of 3.2 beer. Appellant swore he had only one drink of whiskey at the Aztec, and that he drank no beer. He declared he had only three drinks of whiskey during the evening; that he was not intoxicated; and that Kellam drank every time he did. Kellam admitted that in addition to the two drinks he, himself, had had earlier in the evening he took a drink while they were on the way to the Aztec. Miss Fisher said he took a drink after they got there. Once in his testimony Kellam impliedly denied that and later impliedly admitted it. The two girls did no drinking. Summed up, the evidence most favorable to the State indicates the appellant had four or five drinks of whiskey and part of a bottle of beer within a period of about two hours. Kellam seems to have had four drinks of whiskey during the same time. After imbibing the two boys each ate a sandwich. The young people were at the Aztec half an hour or less, and then started back to West Plains, appellant driving and Miss Luna sitting with him. The accident occurred near Pomona, after they had gone seven or eight miles.

As to the effect of the drinking upon appellant. Miss Fisher said you could tell by his eyes and actions that he had been drinking, that was all—he was under the influence of intoxicating liquor but not drunk. Kellam was the same. Kellam testified that appellant was not real drunk at the Aztec but was a little under the influence of liquor, as indicated by the fact that his eyes were red and he talked a little louder than usual. Among the witnesses for the State were two motorists who gave assistance at the scene of the accident, and Sergeant Turnbull of the State Highway Patrol, who saw the appellant and his three companions at the Aztec. Neither of these witnesses was asked or testified about appellant's alleged inebriety. Sheriff Claude Garrett talked to the young people about the time they were leaving the Aztec. It was his opinion that appellant was under the influence of liquor. He was also pretty sure that Kellam had taken a drink, and he thought all four might have been drinking, though he saw no signs of it from the girls. He said he didn't interfere when the party was starting to drive away because he had other business to attend to; he wasn't sure they were leaving; and he didn't know which one was going to do the driving.

When the body of Miss Luna was taken to the hospital of Dr. R. E. Hogan in West Plains shortly after the accident, the doctor was within four or five feet of appellant, and thought he could smell liquor on his breath—but he would not say how far the appellant was under the influence of liquor, or how long it had continued. Miss Fisher testified appellant showed no evidence of intoxication at the hospital, and Kellam declared he, himself, was not intoxicated when they were

there. All this was about 2 A. M. The appellant consulted Dr. E. C. Bohrer regarding his own condition about 5:30 A. M. The doctor examined him and found him suffering from shock, with a bruise on his chest and minor bruises over most of his body. But he discovered no evidence of intoxication and didn't detect the odor of whiskey on appellant's breath. However he would not say this fact excluded the possibility of appellant's having been intoxicated a few hours earlier, and admitted the use of some kind of breath killer could have destroyed the odor.

Regarding the evidence showing how the accident occurred. The only surviving eyewitnesses, beside appellant, were Miss Fisher and Kellam. Both of them testified nothing attracted their attention to appellant's driving until the car began to swerve just before the accident. He had been holding it steady and on the right side of the road. None of the passengers made any complaint. It was night and the road was dark. There was no light in the car. The two seated in the back seat could not, or at least did not, see the speedometer. Miss Fisher said she was not a very good judge of the speed of an automobile, and did not know how fast appellant was driving; and yet, nevertheless, she gave it as her judgment that they were traveling at least 70 miles per hour. Then she said that was just a guess or imagination, but she still maintained the car was going faster than she had ever driven. Young Kellam estimated appellant was driving possibly more than 70 miles per hour when the car began to swerve. Neither of these witnesses was able to tell much about what happened after the car started to weaving back and forth except that it turned over, throwing appellant into the back seat with Miss Fisher and Kellam. They crawled out through the space where the windshield had been, and found the body of Miss Luna lying on the pavement.

Appellant's version was that he was driving 50 to 55 miles per hour, and had had no trouble with the car until a short time before it turned over. He thought the swerving resulted from the collapse of the right rear tire. The right front door came open. Appellant reached over with his right hand and tried to pull it closed, and also took hold of Miss Luna. He was steering the car with his left hand. He thinks he pushed down the foot brake. In about fifty feet the car "started going back and forth." About 100 feet further on was where Miss Luna's body was found. Some fifty feet beyond that the car turned over and the other three crawled out through the windshield. Appellant's theory evidently was that Miss Luna fell out of the car through the door; the State's view seems to be that she was thrown through the windshield. Appellant said the windshield was shattered but that the opening was not large enough, without further breaking, to permit the passengers to get out. Kellam said the hole without enlargement was big enough for all to escape. Miss Fisher testified the boys did break a larger opening. Miss Luna's father

inspected the car several days later and found strands of his daughter's hair on the windshield glass. The windshield was entirely gone when the car was viewed by witnesses after the accident, and most of the glass in the road was close to the body. Also thère was blood there.

Other important evidence is furnished by the marks left by the car on the pavement and shoulder of the road; also the condition of the car, itself. Highway 63 at that point is black top or bituminous surface pavement. Four hundred feet north of where Miss Luna's body was found the highway emerges from a slight, 10 degree curve. Sergeant Turnbull of the State Highway Patrol testified a motorist very easily could drive 60 or 70 miles per hour on this part of the road, though he never had. As we understand the rather complicated testimony (13 photographs attached to the original bill of exceptions were not brought up to this court) the appellant's car had rounded this curve and gone south on the straightaway about 45 feet, when, as shown by the tire tracks, the right wheels ran off the pavement for a short distance and then returned. From there on for over 300 feet the tracks showed the car was weaving from side to side. Some of the marks were considerably wider than the tires, indicating the latter were sliding transversely and that the car was traveling at high speed.

Finally the rubber marks quit showing and from there on something had dug into the pavement. It is inferable that these scars in the pavement were made by the rims of the two left wheels after the tires had come off—for immediately after the accident the tires on that side were gone. Then those marks stopped and below them were marked and scratched places in the pavement at intervals of about 15 feet, supposedly made by the car as it rolled over and over after it had tipped over. A farmer, Jess Swearingen, in front of whose home the accident occurred, thought it lacked only ¼th turn of making four complete rolls, and said it began to turn over 75 feet before reaching the spot where Miss Luna's body was found, and went 75 feet beyond that point where it lodged against a railroad embankment outside the highway boundary.

It was lying on the right side. The glass in the head and tail lights was not broken. The doors on both sides were held closed by the bent running boards, but apparently the glass in them was not broken. Appellant's theory, as stated, was that the car swerved and turned over because the right rear tire went flat. Corbett Watts, a garage operator brought in the wrecked Pontiac the morning after the accident. The right rear tire was flat. The State's witness Jess Swearingen, rather loosely said he looked over the car after the accident and found "the wheels" on the right side were "in fairly good shape." Whether he meant by that that the right rear tire was not flat, we do not know. But another time when asked if there was anything in the skid marks indicating one of the tires was flat, he answered: "No sir;

if there was one there was more than one." He seems to have been a willing witness. At still another place in his testimony he said "the distance the car was run after it was absolutely locked by hydraultic brakes" was an indication of the speed at which it was traveling. There is no evidence in the record, so far as we can find, that the wheels were absolutely locked by hydraulic brakes. Sergeant Turnbull said the tires would not have made marks on the pavement if they had not been sliding sideways, and that where the wheels were running straight forward they did not make marks. If the wheels had been locked, as witness Swearingen volunteered, obviously they would have made marks even when moving straight ahead for they would have been sliding.

We have set out the evidence at some length because we regard the case as close on the facts. The prosecution is not based on Sections 7783 (g) and 7786, Revised Statutes 1929 (Mo. Stat. Ann., pp. 5234 and 5240), which make it a felony to operate a motor vehicle while in an intoxicated condition. Neither is the charge one of second degree murder at common law on the theory that appellant committed a homicide in the perpetration of a felony, i. e., the aforesaid statutory felony of driving an automobile while intoxicated. The information is drawn under Section 3988, Revised Statutes 1929 (Mo. Stat. Ann., p. 2793), in the criminal code, which makes the killing of a human being by culpable negligence manslaughter.

■ It is well settled by our decisions that the culpability necessary to support a manslaughter charge must be so great as to indicate a reckless or utter disregard for human life. [State v. Carter (Mo. Div. 2), 342 Mo. 439, 116 S. W. (2d) 21; State v. Sawyers, 336 Mo. 644, 647, 80 S. W. (2d) 164, 166; State v. Studebaker, 334 Mo. 471, 480, 66 S. W. (2d) 877, 881.] And when the case involves culpable negligence in operating a motor vehicle on a public highway, the standard by which the culpability is measured, is not "the highest degree of care" exacted by Section 7775, Revised Statues 1929 (Mo. Stat. Ann., p. 5197), in the Motor Vehicle Act, but is what a reasonably careful and prudent person would have done or not done in the circumstances, as contemplated by Section 3988, supra, in the criminal code. [State v. Horner, 266 Mo. 109, 113, 180 S. W. 873, 874; State v. Millin, 318 Mo. 553, 558, 300 S. W. 694, 697.] The question before us is whether under these rules and the evidence in this record the appellant was guilty of criminal negligence.

We have seen many cases in which a charge of manslaughter (or of maiming, when the victim did not die) by culpable negligence in operating an automobile was sustained on evidence showing the motorist *ran down* a pedestrian on the highway, or *collided with* another vehicle. All of the sixteen decisions of this court in cases of that char-

acter* were pedestrian or collision cases. In only one of them was the defendant charged with killing a passenger riding with him in his own vehicle, as was the situation here. That case was State v. Scheufler, 285 S. W. 419, where the defendant was driving a truck equipped with two seats behind the driver's cab, one lengthwise on each side of the body. Six passengers, among whom was the deceased, were riding on these seats. The truck was going south on Broadway in St. Louis about six o'clock one Sunday evening in August, at a speed of 25 or 30 miles per hour. As it approached the Washington Avenue intersection a street car started across, going west, then slowed up to let another automobile pass on to the north, then accelerated its speed, then came to a complete stop. These movements confused the defendant, who thought the street car was going to let him pass. In an effort to extricate himself he made a quick turn to the west into Washington Avenue, the same way the street car was headed. The truck skidded and turned over against the street car, killing the deceased. This court held the facts made a prima facie case of criminal negligence on the part of the truck driver—a doubtful conclusion it seems to the writer.

But, however that may be, the facts in the Scheufler case were very different from those here. In that case the defendant could see the street car ahead of him and at least was in a position to judge of the peril, while the passengers on the side seats in the rear of the truck were not. In the instant case Miss Luna was seated beside appellant on the front seat and Miss Fisher and young Kellam were on the back seat. They could see what appellant was doing as he drove the first seven or eight miles from the Aztec Inn. None of them objected or saw anything to engage their attention. Appellant was holding the car steady on the right side of the road. He was driving fast but there was no car or other obstruction ahead of him and only a slight curve in the road followed by a straightaway at the place where the car started to swerve. One could very easily drive 60 or 70 miles per hour at that point, the State's witness Sergeant Turnbull testified. The two boys had been drinking—how much is in dispute—but there is nothing in the evidence to indicate it affected appellant's ability to drive his car, unless we draw the inference that he suddenly succumbed to its influence when the car began to swerve;

*State v. Watson 216 Mo. 420, 115 S. W. 1011; State v. Gardner, 250 Mo. 426, 157 S. W. 84; State v. Horner, 266 Mo. 109, 180 S. W. 873; State v. Miller, 234 S. W. 813; State v. Winkler, 309 Mo. 28, 273 S. W. 1040; State v. Renfro, 279 S. W. 703; State v. Scheufler, 285 S. W. 419; State v. Millin, 318 Mo. 553, 300 S. W. 694; State v. Ritter, 2 S. W. (2d) 753; State v. Murphy, 324 Mo. 183, 23 S. W. (2d) 136; State v. Carlson, 325 Mo. 698, 29 S. W. (2d) 135; State v. Melton, 326 Mo. 962, 33 S. W. (2d) 894; State v. Studebaker, 334 Mo. 471, 66 S. W. (2d) 877; State v. Sawyers, 336 Mo. 644, 80 S. W. (2d) 164; State v. Campbell, 84 S. W. (2d) 618; State v. Carter, 342 Mo. 439, 116 S. W. (2d) 21, 22.

and exclude beyond a reasonable doubt the possibility that the collapse of the back tire caused the accident.

We are reminded by the learned assistant Attorney General, however, that Miss Fisher and Kellam said appellant was driving at an excessive speed beyond 70 miles per hour. Miss Fisher did say that—after disclaiming she was a good judge of automobile speeds—but admitted her estimate was guess or imagination. Kellam gave the same estimate. Testimony of this character is received by the courts *ex necessitate* and goes to the jury for what it is worth. [State v. Watson, supra, 216 Mo. l. c. 433, 115 S. W. l. c. 1011; 70 A. L. R. 540, note; 94 A. L. R. 1190, note.] But the testimony in this instance was given by non-experts; they were riding in the back seat of the car at night on a black top road when it was dark outside; and they were paying no attention to the driving. At most it can be nothing more than an opinion that the car was going at a fast but not dangerous speed. Otherwise, why didn't the girls protest? Neither of them had been drinking.. In the view of the writer this testimony has little if any value in impeaching the testimony of the appellant that he was driving 50 to 55 miles per hour.

The physical facts—the skid marks of the tires on the pavement for a distance of 100 yards, the dents in the pavement after two of the tires came off, and the turning over of the car several times—all show the car was going fast, though it seems the only broken glass in it was in the windshield. But there is no evidence that these conditions might not have been produced if the car was traveling only 50 or 55 miles per hour. This case has perplexed the writer. Driving a motor vehicle while intoxicated is inimical to public safety, and no court should condone it. But statutes have been enacted specially dealing with that offense and making it a felony, Sections 7783 (g) and 7786, supra. We cannot convict the appellant of manslaughter merely because he had been drinking. Neither can we apply the doctrine of *res ipsa loquitur* to the case and say he is guilty of manslaughter because his car, on a trip theretofore uneventful, turned over while traveling at a fast but unascertained speed on an open, unobstructed straight pavement. To say this was negligence indicating an utter disregard for human life is going pretty far. [See 99. A. L. R. 813, note.]

But it is unnecessary to hold finally and definitely that the State failed to make a case for the jury. We can at least say it was a close case where procedural errors against appellant more likely would be prejudicial and ought to be scrutinized closely. There were such. During the presentation of the State's case in chief the prosecutor asked Miss Luna's father if appellant had attended her funeral, and the father promptly answered in the negative. Appellant's counsel objected and the court struck out the question and answer, but refused to reprimand the prosecutor. At the close of

appellant's direct examination, he was asked by his counsel if he had any intention of injuring, hurting or killing Miss Luna. The prosecuting attorney objected on the ground that it was not charged appellant had killed her intentionally but the objection was overruled and appellant answered that he had no such intention. Thereupon, the prosecutor proceeded to build up this false issue in cross-examination. He elicited from appellant the statement that he and Miss Luna were sweethearts and had been keeping company almost nightly for about six months, and that he was sorry he killed her. Then having erected the target the prosecutor proceeded to shoot at it.

Over the strenuous objection of appellant's counsel, the prosecutor was permitted to ask the appellant if he had not stated in a restaurant in West Plains later on the night of the homicide that he guessed he had had a bad wreck for he "had killed a damned girl." (The court stated it was allowing the question because the appellant had expressed a kindly feeling for the deceased.) The appellant denied making the statement in the restaurant whereupon the court permitted the State to introduce two witnesses who said they heard him make it. Also the prosecutor asked the appellant the question previously ruled out, whether he had attended Miss Luna's funeral. The court again excluded the question but refused to reprimand the prosecutor—in fact rather defended him and took the blame itself. Owing to the prominence thus given the matter, appellant's counsel felt forced to go into it, so appellant was asked and testified that he was confined to his bed at the time of the funeral. All this evidence was foreign to the issue of unintentional homicide by culpable negligence, and we think it was prejudicial to appellant. Further, we take the view that the error was not so far invited by appellant's counsel when they asked him if he intended to kill Miss Luna, as to open the doors to all that followed.

For the error in the admission of this testimony the judgment is reversed and the cause remanded. All concur.