State of Missouri, Respondent, v. Gordon B. Adams, Appellant, No. 41398—224 S. W. (2d) 54.

Division One, November 14, 1949.

*Will H. Hargus* and *C. E. Groh* for appellant.

*J. E. Taylor,* Attorney General, and *Frank W. Hayes,* Assistant Attorney General, for respondent.

BRADLEY, C.—Appellant was convicted of manslaughter by culpable negligence under Sec. 4382 R. S. 1939, Mo. RSA Sec. 4382; punishment was fixed by the jury at two years in the penitentiary; he appealed.

Appellant in his brief assigns error (1) on the sufficiency of the evidence; (2) on the admission of evidence; (3) on the State's instruction 2; (4) on the first paragraph of instruction 5 and the refusal of 5A requested by appellant; and (5) on remarks of the court.

Appellant resided in Blue Springs, Jackson County; September 11, 1946, he went hunting in some woods along Burrus Road, a gravel road extending south from U. S. Highway 40; he drove his 1931 Pontiac; left his gun some place along Burrus Road and in the late afternoon went back for it; on the return trip, after getting his gun, his car while traveling north and while crossing highway 40, collided with an eastbound truck driven by A. L. Bosley who was fatally injured.

Highway 40 where Burrus Road extends south is separated into two paved traffic lanes, each 22 feet in width; these lanes are about a half block apart; the south lane is for eastbound traffic and the north lane for westbound traffic. Burrus Road does not extend farther north than to the north traffic lane of highway 40. According

to the State's evidence appellant's car hit the right rear wheel and fender of the truck in the intersection of Burrus Road and the south lane of highway 40; appellant was driving 15 or 20 miles per hour and the truck was traveling 45 or 50; after the impact the truck skidded about 100 feet and turned over; Bosley was thrown on the concrete pavement of highway 40 and received fatal injuries; the truck, before coming to rest righted itself and stopped upright 66 feet east of the point where it turned over.

There was a stop sign on Burrus Road about 20 or 25 feet south of the pavement of the south traffic lane of highway 40; appellant, according to the State's evidence, did not stop at this sign, and was so intoxicated that he was unable to walk without assistance when the highway patrol arrived 10 or 15 minutes after the collision. Appellant drove his car zigzag going south on Burrus Road after his gun and the same on his return north; near the home of Mr. and Mrs. Cassity who were State witnesses and who lived on Burrus Road about a quarter of a mile south of highway 40, appellant, on the trip south on Burrus Road, got the right wheels of his car over in the underbrush along a fence row; then backed his car into the Cassity yard. After the impact he continued north to the north lane of highway 40; then backed his car south and over the south lane of 40 and stopped south of 40 and on the east shoulder of Burrus Road. When the highway patrol appeared appellant was still in his car and was not able to or did not give his name; only mumbled when attempting to talk; he did say, however, that he was not injured and that he was alone.

A patrolman took appellant's billfold from his pocket; found his driver's license and ascertained his name. Two half pint bottles of gin partly filled were in the car; both on the floorboards on the driver's side or one in the seat and one on the floor. According to the State's evidence the odor of liquor was on appellant's breath.

The point of impact was east of the center of the intersection and about 11 feet north of the south side of the pavement of highway 40. If the truck of the deceased was traveling 47½ miles per hour (the average of 45 and 50) it was traveling approximately 71 feet per second, and if appellant's car was traveling 17½ miles per hour (the average of 15 and 20) it was traveling approximately 26 feet per second. For the impact to have occurred at the point fixed by the evidence, not considering any slackening of speed by either, the truck was approximately 30 feet from the point of impact and west of the intersection when appellant entered upon the pavement. The case was tried on the theory that the *intersection* was a 22 foot square, the west side of which was a line on the west side of Burrus Road and extended north across the south lane of highway 40.

Appellant testified that before he started back after his gun he purchased two half pint bottles of gin in Lee's Summit; that at

the filling station in Lee's Summit where he had left his car, "several fellows around there" took a drink of his gin, and in this he was corroborated by two of those who took a drink of his gin. There was evidence that appellant was not intoxicated when he started back after his gun; he testified that he had taken only one drink; that he left the filling station "close to" 5 p. m. to go after his gun; that he got to the place where his gun was about 5:30 p. m.; that he did not get in the fence row or in the Cassity yard and that Burrus Road was "rough and rutty". The State's evidence was that Burrus Road was smooth, a good road. As to his trip back north on Burrus Road and what occurred he testified:

"When I got to the top of the hill (near the stop sign) I stopped and shifted into low gear; when you get up the steep part of the hill there is a level place pretty close to the stop sign; that is 25 or 30 feet from the pavement of highway 40; there was a ditch 5 or 6 inches deep only a few feet south of the pavement (a water line had been run across Burrus Road). I saw two cars on highway 40 to the west coming through what I call a cut, and at the time I shifted gears they were just coming out of the cut 200 or 300 yards away; when my back wheels crossed the little ditch the front of my car was about to the pavement; possibly just on the pavement; these two cars coming from the west were then 250 or 300 feet back that way (west); the one that was in the rear had passed the other and was still on the north side of the highway approaching the intersection as I was starting across it; it didn't appear fast like it did later when it got close to me; it was my opinion I could cross in safety; I was in low gear and going about 10 miles per hour; the man (deceased) was getting closer all the time and was still on the north side of the road and as I pulled on the road I put on my brakes attempting to stop; when I put on my brakes I was possibly 4 or 5 feet in the highway; as he (deceased) got closer it appeared to me he was out of control and swerved and cut back with the front of his truck, some part of the front of his truck into the front of my car. If I was moving then it was barely moving; some part of the front of his car hit the front of my car (appellant's front bumper was offered in evidence); when the cars collided it threw my head against the door and upright piece, and knocked me out; made me groggy. Q. What happened after that? A. As to that I would not say for quite sometime, several hours; some say I pulled off the road and some say I backed across the road; as to that I would not make an answer; I do not know." Asked by his counsel, appellant said that in 1940 he pleaded guilty at Osceola, Missouri, to operating a car while intoxicated.

On cross-examination appellant testified that either the right front wheel or the bumper of the truck came in contact with his car; that the only damage to his fender was "this mark you can scarcely see" on the right; that there was no damage to his "left bumper"; that

he was not positive that the truck was 200 to 300 feet away from the intersection when he was 2 to 4 feet on the pavement, but that it was "back quite a distance".

Joe Rumbaugh, a witness for appellant, testified that he saw the accident; that he was riding in an eastbound car driven by a Mr. Limbacher; that he was in the front seat; that the truck involved in the accident passed the Limbacher car about 200 to 225 feet west of the intersection; that the speed of the Limbacher car was 35 or 40 miles per hour and that the speed of ▮▮▮ the truck was between 50 and 55; that when appellant's car reached the intersection the truck was about 200 feet west and was on the north slab and did not go back on the south slab before the collision; that the speed of appellant's car was 10 to 15 miles. The truck was "off the highway on the north side with the rear left wheel and the front wheel, and going down the highway almost to the intersection, it seemed like about the time he got to the intersection he tried to cut back on the highway, in fact causing the impact with the Pontiac. Then it seemed as though he was out, got out of control, and he went down the highway sideways, and skidding going sideways before he turned over. * * * Q. Did he (deceased) seem to slacken his speed any from the time he passed you until he had passed the sedan (appellant's car)? A. No, sir, he did not. Q. What parts of the two cars appeared to you to collide? A. Well, the front of Mr. Adams' car and the front of the weapon carrier (the truck) the way it was skidding sideways. When he came back in the intersection the front portions of each car seemed to contact". Photographs of the truck showed the front part was damaged.

Carl Kisslind was in the rear seat of the Limbacher car and was a witness for the State. He testified that the truck passed them about 200 yards west of Burrus Road; that the speed of the car he was in was between 40 and 45 and that the speed of the truck was between 45 and 50. "Q. Is there a speed limit on that highway? A. No, there is no speed limit there at all. Q. After this Dodge (the truck) had passed, I wish you would tell the court and jury what, if anything, occurred as this carrier (the truck) reached Burrus Road intersection with #40 highway. A. The Dodge weapon carrier passed us without any trouble at all, and I was watching it because I had not been out of the Army too long, and I was looking to see what one of the surplus vehicles was like, I mean the pick-up. As he passed us he got ahead of us a little way. He came up opposite Burrus Road, and then another car, which was a '31 Pontiac, which was not driving very fast, came out of Burrus Road and hit the right rear wheel and fender of the weapon carrier, which caused the weapon carrier to swerve to the side and started skidding for a considerable distance and rolled over once completely."

To make negligence culpable under Sec. 4382 and to make it manslaughter if death results, the particular negligent conduct must be of such reckless character as to indicate an utter indifference for human life. State v. Ruffin, 344 Mo. 301, 126 S. W. (2d) 218; State v. Bolle (Mo. Sup.), 201 S. W. (2d) 158; State v. Sawyers, 336 Mo. 644, 80 S. W. (2d) 164; State v. Schneiders, 345 Mo. 899, 137 S. W. (2d) 439; State v. Studebaker, 334 Mo. 471, 66 S. W. (2d) 877. "The rule is settled that negligence to be culpable within the meaning of the manslaughter statute, Sec. 4382 R. S. 1939, Mo. RSA Sec. 4382, must be more than ordinary common law negligence. It must be so great as to indicate a reckless or utter disregard of human life. Neither can we convict appellant merely because he had been drinking; nor by an application of the doctrine of res ipsa loquitur." State v. Simler, 350 Mo. 646, 167 S. W. (2d) 376, l. c. 382. The fundamental requirement to fix criminal responsibility for the consequences of culpable negligence under Sec. 4382 is knowledge actual or imputed that the negligent act would tend to endanger human life. State v. Studebaker, supra, 66 S. W. (2d) l. c. 881, and authorities there cited. Under the evidence the jury could have inferred that appellant, when he drove upon the pavement of highway 40, was so intoxicated that he was indifferent to danger to others and himself.

Appellant contends, however, that under the evidence he was entitled to the right of way across the intersection and that therefore he cannot be convicted even though drunk. He relies on Sec. 8385 (L) R. S. 1939, Mo. RSA Sec. 8385(L). This section provides: "An operator or driver of a motor vehicle shall have the right of way over an operator or driver of another motor vehicle who is approaching from the left on an intersecting highway and shall give the right of way to an operator or driver of a motor vehicle approaching from the right on an intersecting highway. The right of way shall mean the right to proceed when two or more vehicles will reach such intersection at approximately the same time." Assuming without deciding that appellant had the right of way over highway 40, such did not give him the unqualified right to proceed regardless of the situation. Lowry v. Mohn (Mo. Sup.), 195 S. W. (2d) 652.

Sec. 8755 R. S. 1939, Mo. RSA Sec. 8755, authorizes the State Highway Commission to erect warning signs, etc. at highway intersections. In the brief appellant says: "It does not appear that this court has ever decided the question of whether failure to obey a stop sign by the driver of an automobile approaching an intersection from the right may constitute any negligence. It has been held by the courts of appeals that such failure may constitute ordinary common law negligence but that it is not negligence as a matter of law." Appellant cites Roberts v. Wilson, 225 Mo. App. 932, 33 S. W. (2d) 169; Rodenkirch v. Nemnich (Mo. App.), 168 S. W. (2d) 977. In the Rodenkirch case it is said [168 S. W. (2d) l. c. 979] : "The State

Highway Department, by erecting such signs at highway intersections, cannot create a standard of conduct for drivers of motor vehicles, violation of which the courts must declare to be negligence regardless. of all other facts and circumstances.'' This is a correct statement of the law.

The situation here is not like that in State v. Dixon, 335 Mo. 478, 73 S. W. (2d) 385, where there was a statute making it a misdemeanor to violate a safety traffic rule promulgated by the Public Service Commission under statutory authorization. In the present case the legislature had authorized the Highway Commision to erect the warning sign, that is the stop sign, at the highway intersection, but no penalty was provided for the failure to obey the warning. We think, however, that since the warning sign bearing the word ''stop'' was erected by the Highway Commission under the authority of Sec. 8755, supra, that the failure to obey it might be common law negligence, depending upon the facts and circumstances of the particular case, but it would not be negligence per se. The erection, pursuant to legislative authority, of the warning sign bearing the word ''stop'' had the effect of making Sec. 8385(L), supra, inapplicable as to who had the right of way at this intersection. The fact that defendant may have been the first to arrive at the intersection would not give him the unqualified right to proceed, as above pointed out, but the right to proceed would depend upon the particular facts and circumstances existing at the time with reference to traffic conditions, speeds and distances, and the motor vehicle operators would be governed by the degree of care required of them under the circumstances. Appellant, in the circumstances here, being charged with manslaughter by culpable negligence, was, as pointed out infra, required to use only ordinary care. Whether appellant was negligent in failing to stop at the stop sign at the intersection would depend upon the circumstances shown to exist at the time.

We do not think, under the facts here, that appellant's failure to stop at the stop sign is decisive; nor is the question as to who had the right of way decisive. The important facts are the traffic condition in the south lane of highway 40 at the time appellant came up to and entered upon the pavement, and appellant's negligence, if any, in failing to stop, slow down or swerve as he came up to and entered upon the pavement. Appellant cannot be convicted merely because he was drunk or drinking, or because he failed to stop at the stop sign, but these facts, if established, may be considered along with all other facts. State v. Simler, supra. Since the verdict was against appellant we are of course taking the facts as given by the State's witnesses. While appellant, under a charge of manslaughter by culpable negligence, was only required to exercise ordinary care and not the highest degree of care (State v. Ruffin, supra), we think that under the State's evidence as to traffic on highway 40 at the time,

and that appellant was intoxicated, failed to stop at the stop sign, failed to slow down or stop as he came up to the pavement and entered upon it, and failed to swerve after he entered upon the pavement, the State made a submissible case.

 On the admission of evidence: Albert F. Closson, a highway patrolman, was a witness for the State. Over objection and exception he was permitted to testify that at the intersection of Burrus Road and highway 40, traffic on highway 40 had the right of way regardless of who arrived first. Such is the effect of Closson's evidence. The court permitted him to so testify because he was supposed to know "the State driving rules", and "supposed to be an expert on that because he makes arrests and he should know". On cross-examination appellant's counsel read to Closson Sec. 8385(L), supra, and asked him if his answer was based on that section and he said it was not. It developed that Closson was of the opinion that the stop sign was the last word and that regardless of who was to the right or left [under Sec. 8385(L)] in approaching the intersection, or the distance from the intersection if in sight, the stop sign governed. Closson's notion of who had the right of way as between appellant and deceased is illustrated by a question and answer on cross-examination. "Q. Another man is going east and the slab is 22 feet wide, at what point does that northbound car get the right of way? A. I would say this, if the eastbound car was back at least 300 or 400 yards that the car going north would have the right to go on across." During the colloquy between the court and counsel for appellant about the evidence of Closson as to the right of way, the court, in the presence of the jury, said: "I don't think that section 8385(L) covers the main highways. That means streets, city streets." But for the stop sign Sec. 8385(L) would of course apply to the intersection concerned in the present cause.

Able counsel for the State do not claim that Closson's evidence as to who had the right of way was competent, but say that the evidence was harmless.' We do not agree that it was harmless. Considering the respective speeds and positions of the two vehicles as they approached the intersection as shown by the State's evidence, the question of who had the right of way should have been for the jury to determine without the opinion of witness Closson. While the question as to who had the right of way is not decisive, it is important in properly determining whether appellant was guilty of culpable negligence, and it was the jury's province to determine who had the right of way and not that of the witness. And we might say that the remarks of the court that Sec. 8385(L) applied only to city streets went to emphasize the error in the admission of Closson's evidence as to who had the right of way. We think that the admission of Closson's evidence on the question of who had the right of way was

prejudicial and constitutes reversible error. State v. Foley, 144 Mo. 600, 46 S. W. 733; State v. Walser, 318 Mo. 833, 1 S. W. (2d) 147.

The complaint on instruction 2 is that there was not sufficient evidence to support submission. We have ruled that question.

Instruction 5 was given on the court's own motion, and 5A, requested by appellant, was refused. These instructions submitted contributory negligence of the deceased, and neither should have been given. Contributory negligence by the deceased is not a defense to a charge of manslaughter by culpable negligence. State v. Medlin, 355 Mo. 564, 197 S. W. (2d) 626; 26 Am. Jur., Homicide, p. 231, Sec. 113, p. 299, Sec. 210; 40 CJS, Homicide, p. 853, Sec. 11; Annotations, 67 ALR 922, 99 ALR 833. It is not necessary to say more about these two instructions.

The remarks of the court complained of is what the court said about Sec. 8385(L) applying only to city streets. This point is, in effect, disposed of, supra.

For the error in the admission of the evidence of the witness Closson the judgment should be reversed and the cause remanded, and it is so ordered. *Dalton* and *Van Osdol, CC.*, concur.

PER CURIAM:—The foregoing opinion by Bradley, C., is adopted as the opinion of the court. All the judges concur.