## THE STATE v. ROBERT STEWART, Appellant.

Division Two, December 9, 1922.

1. **INSTRUCTION: Improper Attention to Defendant's Wife.** An instruction for the State telling the jury that "even though you may find and believe from the evidence that the deceased had been paying defendant's wife improper attention, still such fact, if true, would afford no excuse or justification for defendant shooting and killing deceased" is not error in a case in which the evidence warrants the giving of it.

2. ———: ———: **Sufficient Evidence.** The inference to be drawn from defendant's own testimony that he had asked deceased to cease visiting his wife and talking to her is that defendant had regarded deceased as guilty of improper attentions to her, and justified an instruction telling the jury that if they found and believed from the evidence that "the deceased had been paying defendant's wife improper attention," such fact, if true, afforded defendant no excuse or justification for shooting and killing deceased.

3. ———: ———: **Invited by Defendant's Refused Instruction.** The giving on behalf of the State of an instruction telling the jury that if they find and believe from the evidence that "the deceased had been paying defendant's wife improper attention, still such fact,

State v. Stewart.

if true, would afford no excuse or justification for defendant's shooting and killing deceased," was· invited by the request by defendant of refused instructions telling the jury that they "must take into consideration all the facts and circumstances in this case, and this includes the relations, if any, between the deceased and defendant's wife," and that "while in law it is true that the mere fact that deceased had been paying attention to defendant's wife constitutes no excuse or justification for the shooting and killing of deceased, still, such fact, if you find it to be a fact, may be taken into consideration by you with all the other facts and circumstances in the case in determining the guilt or innocence of defendant," and was further invited by defendant's request at the close of all the evidence that "the court instruct the jury upon what consideration to give to the evidence about the relations between deceased and defendant's wife," and such requests removed all possible doubt concerning the propriety of giving said instruction on behalf of the State, although the testimony is not clear as to the character of the alleged improper attentions of deceased to defendant's wife.

4.  **JUROR:·Relative of· Deceased: Knowledge.**  The clear purpose of the statute (Sec. ´4011, R. S. 1919) declaring that no "person of kin" to deceased or defendant is a competent juror is to secure fair and unprejudiced jurors, but it is in realty knowledge of such relationship that makes the juror biased and prejudiced.  And where the juror on his *voir dire* examination swore that he was not related to deceased, and after a verdict  of guilty it developed that he had never before heard that he was of kin to deceased, and the only testimony that he was so related was the testimony of another man of the same name that the mother of deceased and· the father of the juror were own cousins, and the trial court heard all the evidence and overruled the motion for a new trial, thereby necessarily determining either that no relationship in fact existed between the juror and deceased or that if such ·relationship existed the juror was ignorant of it and could not have been influenced by it, it will not be ruled on appeal that the juror was incompetent or that he was related to deceased.

Appeal from Pike Circuit Court.—*Hon. Edgar B. Woolfolk,* Judge.

AFFIRMED.

*Pearson & Pearson* for appellant.

(1) The court erred in giving Instruction 11. First, because it is not predicated on any evidence given in this case. There was no evidence of any "improper attentions." Second, because it emphasized, and rendered conspicious, for the consideration of the jury, an alleged or presumed fact, concerning which there was no evidence whatever, and, in so doing, the jury might well have believed the court thought there was evidence tending to support the issue, while in fact there was none. Third, because it gave undue prominence to a particular matter, or fact, concerning which there was no evidence, and which ought not to have been brought to the special attention of the jury, by an instruction of the court. (a) An instruction not predicated on evidence is erroneous. There was no evidence upon which to base or support said instruction, and it should have been refused. State v. Hargrave, 188 Mo. 337, 350; State v. Edwards, 203 Mo. 528, 539; Crow v. Houcks Mo. & Ark. Railroad, 212 Mo. 589, 604; Harrison v. Lathland, 189 Mo. 581, 608; State v. Allen, 116 Mo. 555; State v. Parker, 106 Mo. 225; State v. Herrill, 97 Mo. 111; Chambers v. Railroad Co., 111 Mo. App. 612. (b) Instructions singling out particular facts are erroneous. Specially is this true when there is no evidence of such alleged or presumed fact. Instruction eleven was an attempt, and had the effect, to emphasize and render conspicuous for the consideration of the jury, an alleged, or presumed, fact concerning which there was no testimony whatever. From this instruction the jury had a right to conclude, that the court believed there was evidence of "improper attentions." This was harmful error. Shanahan v. Transit Co., 109 Mo. App. 233; Imboden v. Union Trust, 111 Mo. App. 220, 243; Eckhart v. Transit Co., 190 Mo. 593, 620; State v. Hibler, 149 Mo. 478; State v. Jackson, 105 Mo. 196; State v. Williams, 136 Mo. 293, 308. (c) There was no evidence of "improper attentions" in this case,

and, there was no claim made to or before the jury by the defendant, that "improper attention" would afford an excuse or justification for defendant shooting and killing the deceased. It was error for the court to call the jury's attention to a particular fact developed (or undeveloped) in the testimony, and direct the jury that it does not justify conviction. State v. Rafferty, 252 Mo. 72, 80; State v. Lewis, 264 Mo. 420, 432. (2) The motion for new trial should have been sustained, because there was a juror, that qualified, and sat on this panel, after he had been informed by a kinsman, that he was of kin to deceased. This information did not come to defendant, nor his attorneys, until after the verdict was rendered. The information that was given to the juror C. D. Sidwell that he was kin to deceased, was given to him by a kinsman, Weeden Sidwell, after he had been selected as one of the forty; and, before he had qualified as one of the twelve to try the case. It then became the juror's duty, if he did not know of the fact of kinship before, to divulge this information to the court, before he was selected as one of the twelve. Weeden Sidwell's knowledge and information was positive and direct. He knew the mother and father of the juror, and also of the deceased; he gave the names of each. Sec. 4011, R. S. 1919. It makes no difference, whether the juror knew for certain, whether he was of kin or not; after he received the information that he did from his kinsman, it was his duty to then inform the court in order that no chances be taken. The statute does not fix any degree of consanguinity or affinity, in a criminal case, within which a juror can serve. The statute absolutely prohibits a person of kin in any degree of consanguinity or affinity to serve as a juror in a criminal case.

*Jesse W. Barrett,* Attorney-General, and *Henry Davis,* Assistant Attorney-General, for respondent.

(1) The instructions given by the court were proper ones and covered the issues. State v. Harrod, 102 Mo.

597; State v. Harper, 149 Mo. 514, 523; State v. Hudspeth, 159 Mo. 178, 193; State v. Lewis, 264 Mo. 420, 430; State v. Gibbs, 186 S. W. 986. (a) The court did not err in refusing appellant's Instructions 7, 8 and 9. State v. Stewart, 278 Mo. 191. (b) The court fully instructed on all the law of the case and no exceptions were taken for a failure to more fully instruct. State v. Cook, 207 S. W. 831; State v. Wansong, 271 Mo. 51, 58; State v. Magruder, 219 S. W. 700. (2) This court is concluded by the finding of the trial court on a fact as to which the proof conflicts. State v. Brooks, 92 Mo. 542, 575; State v. Rasco, 239 Mo. 535, 584. The statute does not disqualify a relative of the deceased person from sitting on a jury trying the defendant for killing that person. Sec. 6632, R. S. 1919.

DAVID E. BLAIR, J.—Tried for murder in the first degree for the killing of Walter Allison in Pike County on December 23, 1916, defendant was convicted of murder in the second degree and sentenced to a term of ten years in the penitentiary.

The case was here on former appeal. The opinion of the court thereon is reported in 278 Mo. 177. That trial resulted in a conviction of murder in the same degree and a like punishment was imposed. The facts stated in that opinion are practically identical with those in the case before us. There is, however, some difference in details.

The undisputed facts are that the deceased, Walter Allison, and the defendant were farmers living in the same neighborhood in Pike County. Defendant had a wife and five children. Deceased was single and about thirty-nine years of age. He was about six feet in height and weighed between 170 and 180 pounds, and apparently prided himself upon his strength. Some trouble had occurred between the two men over the conduct of deceased with defendant's wife. The testimony did not develop the nature of such relations, but defendant had objected to deceased's conduct and he testified that he

asked deceased to cease visiting his wife or talking to her. It may safely be assumed that defendant thought deceased was paying improper attentions to his wife, or he doubtless would not have objected. Apparently the evidence on this point was more ample on the first trial than upon the last trial.

On the forenoon of the tragedy and shortly before twelve o'clock, the deceased and his nephew, Jarvie Allison, walked over from his home to the road nearby, where four rural mail boxes had been put up close together for the convenience of the rural carrier. One of these boxes belonged to deceased, and another to defendant. When deceased and his nephew arrived at the mail boxes, they found Mrs. Stewart, wife of defendant, and Ruby Stewart, his thirteen-year-old daughter there also. Some conversation ensued between deceased and Mrs. Stewart, in which she told him she was not supposed to speak to him. Defendant knew his wife had gone to the mail boxes to await the arrival of the mail for the purpose of transacting some business with the carrier. Defendant saw deceased and his nephew start toward the mail boxes. He thereupon secured a revolver and put it in his right coat pocket, and cut across a barn lot and approached them. Mrs. Stewart saw him coming, and said something about his coming and that there would be trouble. Upon his arrival defendant fired two shots, one of which took effect in deceased's leg and the other in his right side about the eleventh or twelfth rib. Allison died six days later as a result of said body wound. His dying declaration, tending to show the above facts and other facts sworn to by his nephew, was in evidence.

Jarvie Allison was the only witness on the part of the State who testified to the facts attending the killing. His testimony, outside of the undisputed facts above detailed, was that deceased was standing near his mail box where he had been counting some money to put in the mail box, probably with a letter, to be taken by the carrier. He had dropped his gloves in the road. When defendant

approached, he said "Hey, Jarvie; Hey, Walter, God damn you," and immediately began firing at the deceased, just as deceased was in the act of picking up his gloves. As deceased fell he said, "Bob, you have killed me." Witness did not see any rocks where deceased was standing, and was certain he was picking up his gloves, and not a rock, at the time the shots were fired, and that deceased did not draw back to throw any rock at defendant.

Mrs. Stewart did not testify.

The testimony of defendant's daughter covered the undisputed facts, and also tended to show that when Mrs. Stewart told deceased her husband was coming, he said: "We will handle him;" that when defendant came up he spoke to the men and told deceased he had promised he would not speak to them and would shun them in a crowd. Deceased reached down and picked up a rock to throw at defendant, and said "that he would smash his God damn brains out." Deceased was left-handed and drew back his left hand to throw at defendant; that defendant then shot twice; that deceased's gloves were on the mail box and not lying in the road; that defendant did not use any curse words.

Defendant testified that he had a conversation with the deceased the day before the killing concerning his conduct with his wife in which he asked him to cease visiting his wife or talking to her; that when he approached deceased he said: "Hey, Jarvie; Hey, Walter, what did you promise me yesterday?" That deceased started after a rock and said, "You God damn son of a bitch you, I will mash your God damn brains out;" that he shot just as deceased started to throw a rock and it rolled nearly to his feet; that he shot simply because deceased was aiming to hit him with a rock.

Defendant admitted that he did not have the revolver in his possession when he saw deceased start toward the mail boxes, and that he procured it afterwards and started to the spot where deceased and his

wife were; that he went over there to get his wife away from the company of the deceased and his nephew. Defendant testified that he secured the rock he claimed deceased threw at him and delivered it to the justice of the peace. After taking his wife and daughter home defendant started to town to give himself up and met the constable on the way.

The trial court instructed upon murder in the first degree, murder in the second degree and self-defense. We have examined the files in the case when it was here on the first appeal and find that the instructions given at the two trials were practically identical. The motions for a new trial and in arrest of judgment raised many of the same questions which were decided on the first appeal. Appellant has apparently abandoned all the contentions made in said motions in the last trial, except two, and we deem it unnecessary to consider more than those two questions. In his brief appellant says: "Defendant appeals, and presses as reversible error in this case the instruction numbered 11 above referred to; and also the kinship of the juror to deceased." In his formal assignment of errors appellant confines himself/ entirely to these two questions.

I.   The court gave instruction numbered 11, which is as follows:

"The court instructs the jury that even though you may find and believe from the evidence in this cause that the deceased, Walter Allison, had been paying defendant's wife improper attention, still such fact, if true,
<span style="float:left">Instruction.</span>   would afford no excuse or justification for defendant shooting and killing the deceased, Walter Allison."

This instruction in identical language, except in one or two unimportant respects, was fully approved in Paragraph III of the opinion on the first appeal, 278 Mo. l. c. 190. All the judges en banc, except BOND, C. J., not sitting, and WOODSON, J., absent, concurred in said para-

graph. The correctness of the instruction may therefore be safely assumed, provided the evidence at the second trial was sufficient to warrant giving it.

Appellant contends there is no evidence of "improper attentions" and that said instruction emphasized and rendered conspicuous an alleged or presumed fact concerning which there was no evidence. We held on the first appeal that the instruction did not single out or give undue prominence to the testimony upon which the instruction was then based. As before noted, the evidence upon the second trial was not entirely the same as upon the first trial. On cross-examination of Jarvie Allision counsel asked the following question: "When did you first find out that Mr. Stewart and Walter Allison had had some trouble or words about his, Walter Allison's, conduct with Stewart's wife? A. I hadn't found it out." Defendant testified that:

"Q. . . . Prior to December 23, 1916, had you had any conversation with the deceased about his conduct with your wife? A. I had a conversation with him the day before. Q. The day before? A. Yes sir. Q. I will get you to state whether in that conversation you asked him to cease visiting your wife or talking to her? A. I certainly did."

The inference arising from the defendant's request that Allison cease visiting his wife is that defendant regarded deceased as having been guilty of paying his wife improper attentions, else he would not have made the request concerning which he testified. There was therefore a basis in the testimony for said Instruction 11.

More than this, the giving of the instruction was invited by defendant. At the close of the testimony the defendant asked the court to instruct the jury that they could take into consideration the relations between defendant's wife and the deceased and the fact that deceased had been paying attention to defendant's wife. We quote refused Instructions 7 and 8, as follows:

"7. The court instructs the jury that in arriving at your verdict in the case and in determining the guilt

or innocence of the defendant, you must take into consideration all the facts and circumstances in this case and this includes the relations, if any, between the deceased and defendant's wife.

"8. The court instructs the jury that while in law it is true that the mere fact that deceased had been paying attention to defendant's wife constitutes no excuse or justification for the shooting and killing of the deceased, still such a fact, if you find it to be a fact, may be taken into consideration by you with all the other facts and circumstances in the case in determining the defendant's guilt or innocence of the defendant."

Finally not content with the court's refusal of the foregoing requested instructions, the defendant made the following request:

"At the close of all the evidence in this case the defendant requests the court to instruct the jury upon what consideration to give to the evidence about the relations between deceased and defendant's wife."

Our conclusion is that there was sufficient evidence upon which to base Instruction 11 and that all possible doubt concerning the propriety of instructing upon the subject is removed because the defendant requested the giving of an instruction upon that very subject. The testimony is not clear as to the character of the alleged improper attentions to defendant's wife by the deceased, but the inference is clearly justified that such attentions were deemed improper by defendant because of his objection thereto. The giving of such instruction was not error under the evidence and all the circumstances.

II. The second assignment of error is the refusal of the trial court to grant a new trial because one of the panel of twelve jurors, C. D. Sidwell, was related to the deceased and failed to disclose such fact. Said juror stated on his *voir dire* that he was not related to the deceased or to the defendant. The discovery of the alleged relationship was not made by defendant until after the verdict was returned.

Section 4011, Revised Statutes 1919, is as follows: "Where any indictment or information alleges an offense against the person or property of another, neither the injured party nor any person of kin to him shall be a competent juror on the trial, nor shall any person of kin to the prosecutor or defendant in any case serve as a juror on the trial thereof."

The issue of whether or not said juror was of kin to deceased was heard and determined by the trial judge when he passed upon the motion for new trial. Affidavits *pro* and *con* were filed and the court heard testimony on the question. One Weeden Sidwell testified that the mother of Walter Allison and the father of juror Sidwell were "own cousins;" that Sidwell's grandfather and deceased's grandmother were brother and sister. Weeden Sidwell further testified that he had a conversation with juror Sidwell after he was selected as one of the panel of forty qualified jurors, and said juror then told him he had been selected as one of the forty. "I asked him if he knew he was kinsfolks of Walter Allison and he said 'No.' " Said witness admitted he was "a little bit deaf." He said he and juror Sidwell were "own cousins." He had invited juror Sidwell to stay all night with him, and was not certain he had not connected with the invitation the words "you know we are related" or "we are kin." Witness did not disclose his conversation with juror Sidwell until after the verdict was returned. He did not even know he had been accepted and sworn as a member of the trial panel.

Juror Sidwell testified that he was born and raised in Pike County and had spent practically all his life in that county; that he and Weeden Sidwell were third cousins; that he was asked on his examination whether he was related to defendant or deceased and answered that he was not. He testified that he was not related to deceased that he then knew of. He admitted talking to Weeden Sidwell and that he told him that he had been selected as one of the forty qualified jurors. He said that

Weeden told him that he would like to have him come out to the house, but that they were rather crowded. He understood Weeden to say, ''We are kin, I guess you have kinsfolk you invite to come to see you.'' He testified that he did not understand Weeden to say that he was related to the deceased Walter Allison.

Witness further testified that he did not know deceased or his father; that since the trial was over and the question of kinship had been raised, he had inquired of his aunt, a Mrs. Patterson, eighty-one years of age, as to such relationship and she told him that there was no relationship. After making inquiry witness gave it as his conclusion that there was no relationship whatever between himself and the deceased; that he had never heard of such a thing until the question was raised after the trial.

Tom Allison, brother of deceased, testified that his mother was Harriet Sheppard, daughter of Tom Sheppard, and that she had told him that her mother was a Sidwell; that he did not know what family of Sidwells his grandmother belonged to and his mother told him she did not know; that she did not know whether his grandmother had a brother Willis Sidwell (grandfather of juror Sidwell) or not. Witness Allison's mother was seventy-eight years old. He had never heard of any great uncle named Willis Sidwell; that he never knew C. D. Sidwell until he was on the jury; he had never heard of any relationship between himself or deceased and C. D. Sidwell; that Weeden Sidwell claimed relationship to him; he did not know what it was, but thought it was as second or fourth cousin of his mother; that he was present when the jury was finally selected, but did not even know at that time that his grandmother was a Sidwell.

After hearing the testimony, the substance of which we have detailed, the court overruled the motion for new trial, thereby necessarily determining either that no relationship in fact existed or that if such relationship in fact existed that the juror was ignorant of such relation-

ship and could not have been influenced by that fact. The trial judge saw and heard the witnesses on the issue and there was ample evidence to support his conclusion.

If it had developed upon *voir dire* examination that juror Sidwell was related to deceased, it would have been error to have overruled a challenge as to such juror. [State v. Walton, 74 Mo. l. c. 285.] Counsel have not referred us to any case where the facts were comparable with the facts here and we have found none. If the juror was not related to deceased, clearly the court did not err in overruling the motion for new trial.

The court might have concluded there was relationship or that there was some doubt on the question and found that the juror was ignorant of such alleged relationship. There is ample evidence to support such conclusion if he so found. The juror was guilty of no misconduct in failing to disclose a fact he did not know. He could not possibly have been influenced by the fact, if a fact, of such relationship if he did not know such fact, and there could have been no bias or prejudice on his part because of such relationship.

The clear purpose of Section 4011 is to secure fair and unprejudiced jurors. Knowing human frailties, the Legislature knew that knowledge on the part of a juror of relationship to the defendant or the injured party in a criminal prosecution would make a fair trial exceedingly improbable. While the fact of relationship disqualifies the juror, it is really knowledge of such fact on the part of the juror that may be expected to and in fact does make such juror biased or prejudiced.

Our conclusion is that the trial court did not err in overruling the contention that a new trial should be granted when the knowledge of such alleged relationship came to the court for the first time after verdict and, if such relationship actually existed, the juror was not aware of it and consequently was not influenced thereby.

The case was well tried. The verdict is supported by ample evidence. Defendant was accorded a fair and impartial trial before an unprejudiced jury.

The judgment is affirmed. All concur.