**STATE of Missouri, Respondent,**

v.

**Marion MORRIS, Appellant.**

No. 45930.

Supreme Court of Missouri,
Division No. 1.

Nov. 12, 1957.

Louis Kranitz, Theodore M. Kranitz, St. Joseph, for appellant.

John M. Dalton, Atty. Gen., Robert T. Donnelly, Sp. Asst. Atty. Gen., for respondent.

·DALTON, Judge.

Defendant was convicted of manslaughter, a felony, and his punishment assessed at six months imprisonment in the county jail and a fine of $500. See Sections 559.-070 and 559.140 RSMo 1949, V.A.M.S. The charge was based on culpable negligence in the operation of an automobile causing a collision with an embankment and the death of Judith Kay Swafford, a passenger in the automobile. Defendant has appealed and contends that the evidence is insufficient to sustain a conviction for manslaughter.

We shall state the evidence in a light most favorable to the state, since in determining the submissibility of a criminal case, the state's evidence is considered as true and the state is further entitled to the favorable inferences that may be drawn from the facts proven. Defendant's contradictory evidence is to be disregarded. State v. Hinojosa, Mo.Sup., 242 S.W.2d 1, 3; State v. Burkhart, Mo.Sup., 242 S.W.2d 12, 14.

There is substantial evidence tending to show that on October 14, 1955, defendant, age 20, Judith Kay Swafford, age 14, with whom defendant was keeping company, James Rhodd, age 20, and his date Shirley Jean Short, age 15 years, left Shirley's home in St. Joseph, about 7:30 p. m., in a 1955 V–8 Chevrolet automobile for the purpose of attending the Central-Wentworth football game that evening at Lexington, some eighty miles away. Before leaving St. Joseph, the boys stopped at a liquor store and purchased three handy packs of malt liquor and a pint of wine. Defendant, in his own behalf, testified that he purchased six cans of beer, which his evidence showed to be a fermented beverage containing 5.35 per cent of alcohol by weight. Defendant and James started drinking the beer after they made a stop at the Pine Tree gas station on Highway 71. Kay opened two cans and handed one to defendant and one to James. The process was repeated from time to time and James drank six cans of beer before they reached Lexington. While

James did not know exactly how many cans of beer defendant consumed, he testified, "I think Marion (defendant) took a can every time." Defendant testified that he drank three cans of beer and his date (Kay) drank two and one-half cans. The state's evidence was to the effect that neither of the girls drank any of the beer.

The parties came through Liberty, Excelsior Springs, and Richmond and arrived at the game in Lexington just after the end of the second quarter. They sat in the bleachers until about 10 p. m. and, just before the game was over, they returned to the automobile, where they sat and visited. The wine bottle was opened and passed in the automobile and James and defendant both drank from the bottle. As the crowd was leaving the ball game, the parties started back toward St. Joseph. Defendant was operating the automobile. Kay sat to his right in the front seat, with James in the back seat behind Kay. Shirley sat to James' left behind defendant.

In Richmond, the automobile "shot" through a caution light—went through pretty fast—and a police officer, in uniform, stepped out from between two cars and said "Halt", but defendant did not stop, he speeded up. It was a three-light-stop, "in the process of changing from green to red, and it was in the middle, it was the yellow light, on the way down," when defendant went through. James further testified: "We was going through I believe the main part of town and we passed all the cars on— that was in the right lane, and we were in the left lane. We were passing cars, and as we went past the man stepped out and yelled 'Halt'. And then we were passing them afterwards." When one of the girls told defendant he had better slow down, defendant said: "I'll slow down as soon as I get out of town here." After the officer had stepped out and said "Halt" and after defendant had speeded up, he was driving at "65 and up," in Richmond, and before reaching the city limits. Defendant testified that between Richmond and Excelsior Springs, "the road is curvy. Those

who are familiar with it know you can't maintain a high speed on the road." Other evidence showed that defendant left the city limits of Richmond and entered the highway at around 65 or 70 miles an hour and, after he was out of the city limits, he increased speed to around 90 miles per hour. At that speed he passed an automobile and, "around three minutes later, maybe sooner than that," when they were back in their own lane, the wreck happened. James testified: "Well we passed this car and Marion turned to Kay and he said, 'See if this car has a red light on behind us,' and, when he said that, why all three of us, Kay and Shirley and myself, turned around to see, to look at the car behind us, and we seen that there wasn't any red light, so we turned around, and just about maybe a minute or two, then, why then * * * I heard rocks and gravel hitting the pan, the side of the car, and I thought we had a flat, * * and just about that time I heard a girl scream and I threw this arm out here, and that's all I remember till next morning." James did not know whether there was a flat or not, but said that "the back wheel was off the pavement at the time." That's why he figured they had a flat.

There was other evidence that, after the defendant left Richmond, Shirley "yelled" for him to slow down; and that, just before the collision, after they had, on request, looked back to see if there was a red light on the automobile following them, Shirley asked defendant "to please slow down," but defendant did not answer and did not slow down, "he was going too fast." Kay asked defendant to slow down just before the collision. When defendant failed to slow down on Shirley's last request, she put her face down on her hands, because she was scared, and "right then it crashed."

Shirley was knocked unconscious by the impact. She testified: "Well, it just knocked me out, I guess." She regained consciousness in a few minutes and found that she was lying on the ground in a field on the north side of the highway, opposite from where the automobile had come to

rest. Kay was lying on the same side of the highway "down a ways" to the west. James was lying "right next to" Shirley in the field. He too had been knocked unconscious. Where defendant fell after the collision does not appear, but defendant testified that he received a concussion, a laceration on his head and a broken knee cap; that he was hospitalized eight to ten days; and that he first regained consciousness in the hospital at St. Joseph.

The scene of the collision was about five miles east of Excelsior Springs. When the coroner of Ray County arrived at the scene about 10:30 p.m., he found Kay's body was on the north shoulder of the highway, almost opposite where the automobile had come to rest. Apparently it had not been disturbed after the collision. He noted certain injuries at the time, and determined she was dead, but made a further examination at the funeral home in Excelsior Springs. There had been no change in the condition of the body from the first time he saw it, until the final examination was made.

At the scene of the collision, the coroner noted that "there was blood and dirt over her (Kay's) face, her hair was all mangled." There was a bruise on her face, on her chest and on her left limb and she didn't have any pulse, she was dead. In his subsequent examination he found a depression in her skull, at its base, on the right hand side. The depression was about the size "of a quarter of a dollar." There was blood practically all over her head and around her face and eyes and in the depressed area of the skull.

The evidence further tended to show that Kay had attended school in St. Joseph on the day of her death. She seemed to be in good health and normal in every way. She visited with the others on the trip to Lexington and made no complaint as to any illness at the game or afterwards. The state's witnesses noted nothing unusual in her appearance. She talked to the others after they left Richmond, and she was seen to look back, when requested to do so, immediately before the collision. There was no odor of alcohol about her body after her death.

There was other evidence as to the speed at which the automobile was being operated by defendant at the time of the collision. The collision occurred as the automobile was rounding a curve to the left, where the road turned from northwest to west. Two members of the State Highway Patrol arrived on the scene about 11 p.m. following the collision. The automobile operated by defendant had not been moved from its location on the south shoulder of the highway, nor had Kay's body been moved from its position north of the highway and east of where the automobile had come to rest. The top, front, back and both sides of the automobile were so damaged that it was estimated to be a total loss. Defendant's counsel, on two occasions, developed hearsay testimony tending to show the wrecked automobile had three flat tires. The patrolmen observed the physical conditions existing upon their arrival as follows: Beginning at a point 150 feet east of where the automobile had struck an embankment on the north side of the highway, there appeared to be a mark on the edge of the slab where the automobile had left the pavement on entering the curve. Proceeding further west, there were skid marks on the north shoulder of the highway, on the grass and gravel, as if the brakes had been put on hard. There were gouge marks on the embankment where the collision had occurred, and at three other places to the west, but across the grade ditch on the north side of the road, indicating that the automobile had turned, end over end three times and had then slid on its top across the pavement and come to rest on the south shoulder of the highway, some 87 steps, approximately 261 feet beyond the point of collision with the embankment, or a total of 411 feet from where the automobile went off onto the right shoulder of the highway. The path of the automobile, not shown by wheel marks, could be observed from other marks and by debris along the north side of the highway.

There were four of these torn up and marked places and gouges along the highway (the main impact plus three more) each covering an area of something like five feet by five feet, where the physical facts indicated that the automobile had hit and turned over and hit again, and again. No wheel marks appeared, except in the first 150 feet, before the automobile hit the embankment.

The two patrolmen interviewed defendant at the Excelsior Springs Hospital about 12:20 a.m., October 15, 1955. He had been cleaned up, dressed in, put in bed and a dressing had been put on his head injury. He gave them his name and address and other data, but did not make a statement concerning the collision. He was rather incoherent in talking and his answers were not too clear. There was a strong odor of alcohol on his breath, "the smell of alcohol consumed." From the way defendant answered questions at the hospital and the odor of alcohol on his breath, it was the opinion of one patrolman that defendant's ability to drive was impaired prior to the time of the collision, although he conceded it was hard to determine whether defendant was intoxicated or hurt.

Defendant's evidence tended to show that he drank only three cans of beer and no wine; that he was not intoxicated when making the return trip; that he was driving at 50–65 miles per hour when the left rear tire of his automobile blew out, causing the car to swerve and the rear end to leave the pavement, and then the front end followed. He "didn't apply the brakes because the car that was coming on by then was close." Apparently, referring to the automobile he had just passed. The right front bumper of his automobile hit the bank and threw the automobile out of control. His head hit something and that was the last he could remember, until he woke up at the hospital in St. Joseph. Other evidence tended to show that there would have been no residue of alcohol in his system in view of the lapse of time after the three cans of beer had been consumed. In view of the issues presented, we need not further review defendant's evidence.

■ While appellant assigns error on the court's failure to sustain his motions for acquittal offered at the close of the state's case and at the close of all the evidence, it is only necessary to consider the latter. Any error as to ruling the first motion was waived when defendant elected to offer evidence in his own behalf. State v. Bigley, Mo.Sup., 247 S.W. 169; State v. Meadows, 330 Mo. 1020, 51 S.W.2d 1033, 1036(4). We find nothing in amended Supreme Court Rule 26.10, 42 V.A.M.S., in effect at the time the cause was tried in July 1956, which aids appellant's contention that there was no waiver.

Appellant contends that there is no substantial evidence of gross and culpable negligence necessary to sustain a conviction of manslaughter. Appellant's theory is that evidence tending to show the accused had been drinking intoxicating liquor or may have been driving at a negligent speed was wholly insufficient to show culpable negligence. Appellant argues that defendant's main defense, that a tire blew out causing the automobile to leave the highway and collide with the embankment, was never controverted, since "no witness for the state or defendant denied that a tire blew out or went flat." Appellant relies particularly on State v. Ruffin, 344 Mo. 301, 126 S.W.2d 218, 223, where the sufficiency of the evidence was not ruled and where the facts, in certain particulars, were materially different from those shown by this record.

In the Ruffin case, supra, the court said: "We cannot convict the appellant of manslaughter merely because he had been drinking. Neither can we apply the doctrine of res ipsa loquitur to the case and say he is guilty of manslaughter because his car, on a trip theretofore uneventful, turned over while traveling at a fast but unascertained speed on an open, unobstructed straight pavement." 126 S.W.2d 218, 223.

Appellant further argues that "there was no evidence of the cause of death." Appellant, quoting from State v. Schneiders, 345 Mo. 899, 137 S.W.2d 439, 440 says: "The facts and circumstances are insufficient to establish gross carelessness or recklessness incompatible with a proper regard for human life or limb, or a reckless disregard for the consequences of his act from which any criminal intent may reasonably be inferred."

■ "The rule is well established by the decisions of this Court that negligence to be deemed culpable within the meaning of the statute and, therefore, criminal, is something more than ordinary, common-law, or actionable negligence. The culpability necessary to support a manslaughter charge must be so great as to indicate a reckless or utter disregard for human life." State v. Schneiders, supra, 137 S.W.2d 439; State v. Ruffin, supra; State v. Adams, 359 Mo. 845, 224 S.W.2d 54, 57; State v. Hinojosa, supra. In the Adams case the court said: "The fundamental requirement to fix criminal responsibility for the consequences of culpable negligence under Sec. 4382 (RSMo 1939) [V.A.M.S. § 559.070] is knowledge actual or imputed that the negligent act would tend to endanger human life. State v. Studebaker, supra, [334 Mo. 471] 66 S.W. 2d [877] loc. cit. 881, and authorities there cited."

■ In the case at hand there was direct evidence that appellant was operating the automobile at a speed of 90 miles per hour over a curvy road; that he was familiar with the road since he had driven over it earlier the same evening; that he was continuing to operate the automobile at an increasing speed regardless of the requests of the occupants of the automobile that he slow down; and that the automobile left the pavement on the right side of the highway at the beginning of a curve to the left and immediately after having gotten back to its own side of the road after having passed another automobile at the speed of 90 miles per hour. Only appellant testified that a tire blew out before the automobile left the pavement, and he gave that testimony after giving testimony that "the left rear tire of my automobile *apparently* blew out or went flat" and that he *believed* a tire blew out, testimony stricken on motion. The State was not bound by appellant's testimony, nor by the belief of witness James Rhodd that a tire blew out, since there were facts and circumstances, including the fact that the automobile left the pavement at the start of the curve, from which facts the jury could find that the three flat tires mentioned in the cross-examination of the state's witnesses resulted from excessive speed and the resulting collision. There was substantial evidence from which the jury could find that defendant knowingly and intentionally operated the automobile at an excessive and dangerous speed, to the moment of collision. It is unnecessary to review the evidence tending to show that appellant's ability to drive was impaired prior to the time of the collision. Under the evidence in this record the jury could have inferred that appellant, when he continued to operate his automobile at a high rate of speed regardless of the protests and screams of some of the passengers and when he passed an automobile on the said highway under the circumstances shown immediately prior to the beginning of the curve, was grossly indifferent to the danger to himself and others and was proceeding in utter disregard of human life. We must and do hold that there was substantial testimony tending to show that defendant was guilty of culpable negligence in operating the automobile at the time and place mentioned.

As to corpus delicti, appellant says "it was never proved at all," since "the state failed to prove the deceased died in or as a result of the accident to defendant's automobile." Appellant's theory is that "the evidence adduced as to the death of Judith Kay Swafford * * * in no way explained how she died," that "nothing appears in evidence to show in what manner, by what means, or what cause she died",

or that she "was even alive the moment before the accident"; and that the state wholly failed to prove "the manner and cause of death."

■ "In a homicide case the corpus delicti consists of two elements, first, the death of a human being and, second, the criminal agency of another in causing the death. The elements of the corpus delicti may be shown by circumstantial evidence. Corpus delicti cannot be said to be established until it has been proved that the death was not self-inflicted, nor due to natural causes or accident. And, although it is not essential to the proof of the corpus delicti that the criminal agency of the accused be shown, yet, in order to convict an accused, it is necessary to prove his (criminal) agency additionally to the corpus delicti." State v. Meidle, Mo.Sup., 202 S.W.2d 79, 81; State v. Colbert, Mo.Sup., 226 S.W.2d 685, 687; State v. Black, 360 Mo. 261, 227 S.W.2d 1006, 1007.

Appellant relies particularly upon State v. Simler, 350 Mo. 646, 167 S.W.2d 376, 383, where the court said: "There was no direct proof whatever of the cause of deceased's death. No evidence was introduced to show what injuries he sustained, or that they were fatal. In every criminal case the corpus delicti must be proven. * * * The criminal agency was proven —the automobile collision caused by culpable negligence. But was the death produced by it? * * * The evidence shows deceased was lying in the road after the violent collision; that there was a bloody spot there; that he was taken to the hospital; and that he died that night at 2 a. m. Appellant was in the same wreck; was injured and taken to the same hospital; and did not die. It would have been easy to produce evidence as to the nature of deceased's injuries, and to prove whether they were fatal—in other words, whether he died of injuries received in the collision."

In the Simler case there was no living eyewitness to the collision except the defendant and he did not testify. The evidence was all circumstantial, with no substantial evidence of excessive speed in the operation of defendant's automobile, nor of the particular injuries sustained by deceased. The case is distinguishable upon its facts.

Appellant further contends that the state must show more than a mere coincidence of time and place between the wrongful act and the death (26 Am.Jur. 481, Homicide, Sec. 468); and that all authorities agree that when proof of the corpus delicti in a homicide case rests in circumstances, and not on direct proof, it must be the most convincing evidence the case will admit. 26 Am.Jur. 490, Sec. 482.

■■ Considered favorably to the state the evidence shows that deceased had attended public school on the day she died and she had attended the football game that evening. Immediately before the collision the deceased appeared to be in normal health talking to those who were in the automobile with her. Her last words were her request that defendant slow down. Immediately before the collision she was in good health and immediately after the collision she was dead. It is unnecessary to again review the evidence concerning the injuries she sustained, or the facts attending the collision, or where the automobile came to rest, or where the bodies of the survivors fell. There was evidence that the coroner of Ray County examined the body of deceased as it lay on the shoulder of the highway; and that he determined the cause of death and executed and signed the death certificate, but, on objection, a photostatic copy of the death certificate, duly certified, was excluded from evidence on the ground that the certificate showed the conclusion of one not qualified to express an opinion, the coroner being a dentist. However, from substantial evidence in this record the jury could infer that the death of the deceased was not due to natural causes, was not self-inflicted nor due to unavoidable accident to which human fault did not contribute. The evidence was sufficient to support a finding, beyond a rea-

sonable doubt, that Judith Kay Swafford received such physical injuries as a result of the collision that they immediately produced her death. In the trial, defendant in effect conceded the existence of evidence tending to show the manner and cause of the death of the deceased by asking and obtaining Instruction No. 8, which submitted a finding that by reason of a rear tire blowing out or going flat the automobile went onto the shoulder of the highway, struck a culvert and turned over; and that "said Judith Kay Swafford was thrown out of said car and injured, resulting in her death." The instruction was of course offered and obtained on the theory that there was evidence to support it. If there was no evidence to support the instructions of the state and defendant on this issue, it was a common error of which defendant may not complain on appeal. State v. Stewart, 296 Mo. 12, 246 S.W. 936, 938(2); State v. Martin, Mo.Sup., 56 S.W.2d 137, 139(9). The corpus delicti was sufficiently proven. The evidence was sufficient to support a finding that death of the deceased was caused by the criminal agency of the defendant. The court did not err in refusing to direct a verdict of acquittal at the close of all the evidence.

■ Error is assigned on the refusal of defendant's instruction A "for the reason that refusal was refusal to give a mandatory instruction on excusable homicide." The instruction would have told the jury that, "if you find and believe from the evidence that *the events* that occurred at the time and place mentioned in evidence were caused by a flat tire which threw the automobile of defendant out of control, then *such events* were a mere accident and cannot form the basis of culpable negligence as defined elsewhere in these instructions, nor can it support a conviction of manslaughter, and you must acquit the defendant." (Italics ours). Appellant's theory is that the instruction was "an affirmative instruction on the main defense of defendant"; and that it was supported by substantial evidence. The instruction was properly refused. The instruction was too general in

its terms and did not identify "the events" referred to. It did not exclude defendant's culpable negligence in the operation of the automobile at a dangerous and excessive rate of speed as a direct cause of the flat tire, if any. Instruction No. 8, given at defendant's request, fully covered defendant's defense that the collision and wreck were caused by a tire blow out, and it further submitted a finding that defendant was not guilty of culpable negligence as that term was defined in Instruction No. 2. Since the court had instructed the jury on the issues presented by Instruction A, it was not error to refuse a further instruction on the same issues (State v. Tompkins, Mo. Sup., 277 S.W.2d 587, 592) and defendant was not entitled as a matter of right to a further instruction singling out particular facts and directing an acquittal if those facts were believed. State v. Studebaker, 334 Mo. 471, 66 S.W.2d 877, 883(11).

Appellant further contends that the court erred in giving Instruction No. 2 for the reason that the said instruction "assumes" a fact not in evidence, to wit, that the defendant "did give unto the said Judith Kay Swafford numerous bruises, lacerations, and mortal injuries upon the head and body of the said Judith Kay Swafford of which said mortal wounds and injuries given and caused as aforesaid the said Judith Kay Swafford * * * did die instantly." The instruction made no such assumption, but did submit such a finding, prefaced by the words, "If, therefore, you find from the credible evidence in this case, beyond a reasonable doubt." We have previously held that the evidence was sufficient to sustain such a submission. Defendant submitted the same issue. The assignment is overruled.

■ The next two assignments will be considered together. Error is assigned on the court's action in giving Instruction No. 7 "for the reason that the instruction erroneously required the jury to find that the mishap in question occurred without the fault of defendant, in order to acquit defendant." Appellant says the definition of the term "accident", as used in other in-

structions given by the court, was improperly and unduly limited by Instruction No. 7, in that, it permitted the jury to convict defendant if they determined his agency or fault caused the mishap. Error is also assigned on the court's action in giving Instruction No. 8, "for the reason that the instruction should have directed acquittal under the facts therein hypothesized, but addressed itself only to the discretion of the jury, by the use of the words, 'may acquit.'" Appellant's theory is that, although the defendant himself requested both instructions and they were given, as requested, they should have been refused and proper instructions given. These assignments must be overruled. Supreme Court Rule 26.06 expressly provides that a defendant in any criminal case shall have no just cause for complaint of any error committed during the trial at his instance. The matter was formerly covered by Section 545.030, subdivision 1(16), RSMo 1949, V.A.M.S. And see State v. Swiney, Mo. Sup., 296 S.W.2d 112, 116(11); and State v. Clark, Mo.Sup., 277 S.W.2d 593, 601(9); and 24 C.J.S. Criminal Law § 1844, p. 698.

Appellant complains of the court's action in sustaining the state's objection to the argument of counsel raising the question of why witnesses endorsed on the information were not called by the state. Appellant seeks to distinguish State v. Burchett, Mo.Sup., 302 S.W.2d 9, 19(19, 20) on the ground that the court was advised by defendant's counsel that counsel didn't know "where they were and who they were." There was no evidence before the court tending to show that the witnesses referred to were not equally available to the defendant and the state. The assignment is overruled. State v. Burchett, supra.

Appellant's last assignment is that the court erred in failing to instruct the jury on the law of circumstantial evidence. Appellant admits "there was some direct evidence in this case," but argues that the evidence on the main fact issue, to wit, "the cause of the accident—was wholly circumstantial," and any conclusion had to be based upon inferences to be drawn from facts in evidence. Appellant says "the fact of fast driving or of drinking are only facts from which," under certain circumstances, gross and culpable negligence may be inferred. Appellant further says that no witness fixed the exact speed of the automobile at the moment it left the highway and collided with the embankment; and that the state seeks to have the speed at the time of the accident inferred from testimony as to speed before the accident and circumstances occurring afterwards. Appellant also argues that the state seeks to have the inference of intoxication before the accident drawn from the testimony concerning defendant's condition in the hospital after the accident. No issue as to intoxication was submitted to the jury. In this assignment appellant expressly excludes the issue as to the cause of death. Appellant says "we do not say that the evidence of the cause of death was circumstantial; there was no evidence of the cause of death." Appellant finally says that "if there is any evidence of gross and culpable negligence * * * it must be inferred from the physical circumstances observed after the accident and not by any direct evidence.

No instruction on circumstantial evidence was requested and none was given. The state's case was not wholly based on circumstantial evidence. The state's evidence tending to show culpable negligence in the operation of the automobile, and that the cause of the automobile leaving the slab on the right hand side of the highway at the beginning of a curve to the left was speed, was not circumstantial evidence. It was direct evidence of culpable negligence. The assignment is overruled. State v. Famber, 358 Mo. 288, 214 S.W.2d 40, 43; State v. Loston, Mo.Sup., 234 S.W.2d 535, 538(7).

The information was sufficient in form and substance and the verdict responsive thereto. Allocution was afforded and judgment and sentence duly entered and pronounced.

The judgment is affirmed.

All concur.