**STATE of Missouri, Respondent,**

v.

**Walter James HERRING, Appellant.**

**No. KCD 26300.**

Missouri Court of Appeals,
Kansas City District.

Nov. 5, 1973.

Motion for Rehearing and/or Transfer
Denied Dec. 3, 1973.

Michael Paul Harris, St. Joseph, for appellant.

John C. Danforth, Atty. Gen., David Robards, Asst. Atty. Gen., Jefferson City, for respondent.

Before DIXON, C. J., and PRITCHARD and SOMERVILLE, JJ.

PRITCHARD, Judge.

In a tragic collision of a Mustang car with a utility pole on the Belt Highway in St. Joseph, Missouri, appellant's bride of three hours was killed. Her death resulted in a charge of manslaughter against appellant, and a trial to a jury which found his guilt, but which was unable to agree upon punishment. The trial court, after noting appellant's youth (age 17) and the fact that no intoxication was involved, sentenced him to 9 months imprisonment in the county jail.

By Point II, which will be first considered, appellant claims that the trial court erred in not directing a verdict at the close

of the state's opening statement, and in not sustaining his motion for judgment of acquittal at the close of all the evidence. The essence of the argument is that "speed and speed alone" is not in itself sufficient to support a conviction of manslaughter in the operation of a motor vehicle.

The facts, considered in the light most favorable to the state, are these: At the scene of the collision, the Belt Highway was four lanes, each 10 feet wide, with two for northbound and two for southbound traffic. There was a curb on the west side of the highway which was about two inches higher than the surface of the road. The shoulder of the road was covered with frozen dampness. The area to its east and west is occupied by businesses, a shopping center, with a McDonald Hamburger business, a bank, a theater, and other establishments. The occurrence was on a New Year's day, 1972, and the time was about 7:15 p. m. when it was dark.

Officer John Riddle was called to the scene at 7:22 p. m. The weather was then clear, and the cement road surface was wet, but where the traffic had been travelling, it had started to dry off a little bit. The only light was that given by street lights. He testified that he found a 1971 Ford hardtop resting against a utility pole and a gas meter vent. The pole was almost sheered in half, but the wires were intact. The area between Frederick Avenue, from which the roadway sloped to the south, and McDonald's hamburger place is a business area. When he arrived at 7:30 p. m., the traffic was heavy. The speed limit at this point on the Belt Highway was 40 miles per hour.

Skid marks on the roadway were measured by Donald Harris to be 270 feet in length leading from the inner southbound lane of the Belt Highway to the vehicle, which was situated in the northwest corner of McDonald's hamburger place.

George E. Fisher witnessed the collision. He came up to the intersection of Belt and Frederick, and the traffic light turned red. He noticed a Ford Mustang headed south in front of him, "and it was making quite a bit of racket." There was a Ford Torino in the east lane by the side of the Mustang, and there was not any traffic in front of either car, nor behind Fisher or the Torino. The Mustang's driver was sitting there racing his motor which had "glass packs" or cutouts on it to bypass the muffler. There were four people in the Mustang, a male driver (appellant), a female to his opposite, and a male behind the driver and a female on the opposite side. The light changed to green and the Ford Torino pulled away fairly fast, at a high rate of speed, "and the Mustang revved up its motor and went, proceeded to take off, and it kind of killed it." The motor did not completely die. "He kind of pushed the clutch in, what they call double clutching, and caught it and when he let the clutch out it had a tendency to fishtail, go sideways." Fishtail is just a term used for the rear section of a car going from side to side. The tires spun and the car fishtailed just momentarily, then it seemed to get traction and proceeded down the highway. "Well, as I observed it, the Fairlane was still in the center lane. * * * I saw the Mustang proceed away at a fairly high rate of acceleration down the highway. And I happened to notice the car in the center lane. It started putting on its brakes and turned its turn signal on to the left." The car in the center, inward lane, was right about the animal clinic and was getting ready to turn into one of the exits or entrances to the Community World.

The Mustang proceeded on at a fairly faster rate of speed and passed the Torino, which was at a dead stop, and at a speed which Fisher estimated to have been 60 miles per hour. There was no traffic between Fisher, the Torino and the Mustang. Then, after the Mustang passed the Torino, another car started to pull out of either East Hills or Community on the east side of the highway, turning out to go south. It came across three lanes of traffic and went into the southbound fourth lane about a foot (it could have been 2½ feet) with

its front fender section. "When it came out it went there across like it was going to go into the fartherest lane over and then swerved back into the center lane." Fisher did not see any brake lights or anything in the way of deceleration on the Mustang until the crossing car was well into his lane. The Mustang then swerved to the right up on the shoulder, "I would say about two-thirds of it", with the two right wheels and the left back wheel on the shoulder just momentarily. The Mustang was still travelling about 60 miles per hour. Immediately it seemed to be into a broad slide across the intersection and road, went by the car which had pulled out about 5 feet from it, at which time Fisher caught a glimpse of the brake lights going on. It then hit the curb riser on the other side of the road which threw it into the air. It then went on southeasterly and hit a utility pole after sliding better than 200 feet.

Fisher testified that there was no other southbound traffic at the time, and two northbound cars had passed and were about 5 car lengths up to the north when the collision happened. There were also two other northbound cars right about McDonald's at that time. At the time of the collision it was dark, it had been misting, and it was still a little moist on the highway in spots.

Ricky Mulvaney was with appellant, who was driving Ricky's father's car, which had a 428 cubic inch engine and a 4 speed transmission. During the time he was present with appellant, Ricky told him "more than once" to slow down. He did not know how many times he told him. Appellant drove the car well, normal, and Ricky did not ask him to let him drive.

Larry Donald Hall was in the Ford Torino with his girlfriend going south on the Belt Highway at Frederick Avenue. He was in the center lane as he approached the intersection, the traffic light for which was red. As he was waiting for the light to change there were several ve-hicles behind him, and the "Mustang came the light to change there were several ve-hicles behind him, and the "Mustang came on my right." The driver of the Mustang "revved his engine a couple of times." When the light changed, they both took off, and the Mustang seemed to bog down and stop after about four feet. Hall went ahead to the speed limit quickly, but did not spin his tires. The road surface was damp. Thereafter, Hall saw the Mustang in the mirror and heard it coming. "It sounded like it was under acceleration," and it passed him on the right about the first entrance to East Hills, which is the first entrance south of the Howard Johnson restaurant. Hall estimated the speed of the Mustang at between 60 and 75 miles per hour, and as Hall let off the accelerator he saw it go down the highway just a little way and go off the right side of the road with two wheels. This was about the Belt National Bank location on the west side of the road. Hall was then 4 or 5 cars behind the Mustang, and quite a little way ahead of him, 15 or 20 car lengths, was a car that pulled out into Hall's lane. That car came from the Interstate Gas Station on the east side of the Belt, and it pulled out normally and its driver seemed to be careful. The front bumper of that car may have crossed into the westernmost southbound lane (appellant's lane) for just a split second. Hall thought that the pulling out of that car may have shocked the driver of the Mustang a little bit. At the time the car pulled out, the Mustang was about beside Hall, that being 15 or 20 car lengths from the crossing car, and the Mustang then swerved to the shoulder, where it travelled quite a few feet at a speed of about 70 miles per hour. Thereafter, its driver tried to pull back onto the highway and hit his brakes. "That was the first time I saw lights." The Mustang then went by the car that had pulled out from the east, about 15 feet from it, then spun halfway around, slid better than 100 feet at about 60 miles per hour, and collided with the pole.

The opening statement of state's counsel has been reviewed. It sets forth the essence of what the evidence would be in accordance with what was actually developed by the above facts. In such case the trial court did not err in overruling the motion for directed verdict made by appellant at the close of the opening statement. State v. Gray, 423 S.W.2d 776, 785 [17] (Mo.1968) and authority and cases cited.

It is undoubtedly true, as appellant contends, that ordinarily speed, or excessive speed, is an insufficient basis to sustain a charge of manslaugher by culpable negligence. 61A C.J.S. Motor Vehicles § 657(6)b., p. 463; People v. Clark, 130 Ill. App.2d 558, 265 N.E.2d 191, 194 [4, 5]. The Clark case states that rule but goes on: "However, charges of reckless homicide may be justified by a combination of excessive speed *and other circumstances* which would indicate a conscious disregard of a substantial risk likely to cause death or great bodily harm to others, and the circumstances are such that a reasonable person would act differently under the same situation." (Citing cases.) (Italics added.) The term "culpable negligence" as contained in the manslaughter statute, § 559.070, RSMo 1969, V.A.M.S. has been many times defined, and is in capsule in State v. Morris, 307 S.W.2d 667, 672 [3] (Mo.1957), " 'The rule is well established by the decisions of this Court that negligence to be deemed culpable within the meaning of the statute and, therefore, criminal, is something more than ordinary, common-law, or actionable negligence. The culpability necessary to support a manslaughter charge must be so great as to indicate a reckless or utter disregard for human life.' " (Citing cases.) In State v. Adams, 224 S.W.2d 54, 57 [1, 2] (Mo. 1949), cited and quoted in the Morris case, the court said, "The fundamental requirement to fix criminal responsibility for the consequences of culpable negligence under Sec. 4382 (the then manslaughter statute) is knowledge actual or imputed that the negligent act would tend to endanger human life."

From appellant's own testimony it was established that he had grown up, gone to school, and had worked in the St. Joseph community. From this and appellant's detailed description of his destinations, and the areas between and alongside the Belt Highway, the jury could infer that he had knowledge of the physical surroundings of the scene of the collision that night. Shortly before, and after dark, he had started to drive the Mustang, which the jury could find was a high powered vehicle, having a 428 cubic inch engine. As they proceeded to their destination, Mulvaney "more than once" requested appellant to slow down. Yet, after stopping at the Frederick Avenue traffic light, appellant proceeded away from the intersection at a high rate of acceleration, and attained a speed of 60 to 75 miles per hour, 20 to 35 miles an hour above the speed limit at that place. The jury could find that these acts were done in heedless disregard of Mulvaney's previous warnings, and that they showed an irresponsible state of mind. Furthermore, the jury could reasonably find that the highway passed through a congested business area, with several cross-overs for traffic coming from shopping and restaurant establishments on either side, and thus was dangerous for the occupants of a speeding vehicle on the Belt Highway. That there were several other automobiles travelling on the Belt at the time, and the fact (as the evidence shows) that a large crowd gathered immediately after the collision, all gives rise to a legitimate inference that the traffic was somewhat heavy. Appellant knew, or should have known, from all these circumstances and the fact that he had been warned to slow down, that in accelerating from a dead stop to a speed of 60 to 75 miles per hour that there was a likelihood of danger and collision from other traffic and of crossing traffic on the Highway. The crossing automobile is exactly what caused the emergency and appellant's attempted

evasive action, which resulted in his loss of control, still at a high speed, and the ensuing death. All the facts and circumstances show, as the jury could and did find, that appellant was possessed of a careless or reckless disregard for human life and safety, there being in this case much more than a single, isolated instance of excessive speed. It is of no consequence, under all these facts, that there was no evidence of the drinking of intoxicants by appellant, a fact in his cited cases [such as State v. Morris, supra; State v. Duncan, 316 S.W. 2d 613 (Mo.1958); State v. Fennewald, 339 S.W.2d 769 (Mo.1960); State v. Cutshall, 408 S.W.2d 94 (Mo.1966), and the like] which could be considered additionally to excessive speed. A submissible case for the jury was made by the state and appellant's contention to the contrary is overruled.

Appellant claims that five photographs of the car showing it immediately after the casualty were erroneously admitted because they were repetitious and highly prejudicial because they " 'unduly emphasize the claims or the evidence of one of the parties.' " He says that the admission of one or possibly two of the exhibits would properly show the physical damage to his car. These photographic exhibits were not filed with this court, so there is no way to know if they are on their face prejudicially repetitious. One photograph, showing deceased in the car, was not admitted into evidence after it was stipulated that she had died as a result of the collision. Apparently, the five others showed only the physical damage to the car from different angles. The trial court has discretion in admitting cumulative evidence of this nature, especially where it bears upon an issue in the case, here appellant's speed. State v. Tompkins, 277 S.W.2d 587, 591 [10–12] (Mo.1955).

Instruction No. 5 submitted to the jury the hypothesis that appellant "drove an automobile in such a manner as to show a reckless disregard for human life and safety." Instruction No. 6 submitted the same phrase in submitting that appellant's loss of control of the automobile was not caused by the quoted words. Instruction No. 7 submitted that the death was excusable if it was an accident and not the result of "reckless disregard for human life and safety." In three points appellant claims these instructions were erroneous because they omitted any reference or definition of the words "carelessly", "feloniously" and "culpable negligence", which were charged in the information. Appellant did not ask for a clarification or definition of the terms "carelessly" and "feloniously", and may not therefore complain. Compare State v. Shriver, 275 S.W.2d 304, 309 [9, 10] (Mo.1955); State v. Goodman, 490 S.W.2d 86, 87 [1, 2] (Mo.1973), and State v. Durham, 418 S.W.2d 23, 31 (Mo.1967). In reverse application, the words submitting the act was done in "reckless disregard for human life and safety" define "culpable negligence." State v. Morris, supra. See also State v. Cutshall, supra, and Missouri Draft Pattern Criminal Instructions, 6.10 (1973) which uses the words "reckless disregard for human life and safety." Besides, appellant himself used the words "culpable negligence" in Instruction No. A, a converse of that issue, and the words "careless, reckless, felonious and culpable negligence" in Instruction No. B on the issue of accident, all without definition. No error appears with respect to lack of definition of any of the quoted words in these instructions.

Point I submits that the trial court committed prejudicial error in not declaring a mistrial during voir dire examination when two veniremen stated in the presence of other veniremen that excessive and high speed was a fact of the case prior to the giving of any testimony.

Venireman Thornton stated in the presence of the panel that he recalled hearing from the news media that appellant was driving at a high speed. Thornton was excused, after inquiry by the court, because his mind was not free and open to the

facts to be tried. Venireman Goll then stated that he had read of the accident, had visited the scene the next morning, and that he had definite ideas on how the highway was "being used as a speedway and in reckless driving." The court then stated that there was no evidence at the time that the highway was being used as a speedway or that reckless driving was involved. Goll then said, "Didn't this man (apparently referring to Thornton) say that high speed—who said high speed?" Appellant at this point moved for a mistrial upon the ground that "Thornton blurted out high speed, high rate of speed" and was excused, and that Goll heard that statement, which resulted in not only his preconceived fix of mind but it had been conveyed to other members of the jury panel as indicated by Goll, who thought it was already introduced into evidence. The request for mistrial "and have the man discharged" was denied. Later the court excused Goll because of his stated prejudice by what he had seen the morning after the accident.

 Of importance in this case is that after Thornton and Goll were excused, each of the 24 members of the final panel, from which the 12 persons to try the case were chosen, were questioned by counsel for appellant concerning any bias, prejudice or lack of impartiality. Each was asked whether he would consider only the evidence in the case and render a fair and impartial verdict based on that evidence and the court's instructions. No venireman indicated anything that would prevent him from being impartial, and each answered that he could enter a verdict based solely upon the evidence and the instructions of the court. It is thus apparent that the jury chosen to try the case was free of partiality and prejudice, and the trial court therefore did not abuse its discretion in denying the request for mis-trial based upon the statements of Veniremen Thornton and Goll. Compare State v. Scott, 359 Mo. 631, 223 S.W.2d 453, 455 [2, 3], where a prospective juror stated that he knew defendant was guilty and should have to serve on a rock pile the rest of his life. The venireman was instantly excused, and the defendant moved to discharge the entire panel, which motion was denied. The court said that the trial court was in a much better position to evaluate the effect, if any, of such an outburst on others, "so it must be regarded as a matter to be confided to the discretion of the trial court." State v. DeClue, 400 S.W.2d 50 (Mo.1966), cited by appellant, is to be distinguished because the venireman, who stated he had in his business received large numbers of bad checks and indicated difficulty in being impartial, was permitted, over challenge for cause, to serve on the jury. Here, both veniremen who made statements concerning high speed were excused, and the remaining veniremen were qualified as the record shows. Point I is overruled.

The judgment is affirmed.

All concur.